

# SUPREME COURT OF MISSOURI
## en banc

LANCE C. SHOCKLEY,            )
)
         Appellant,           )
)
v.                                )       No. SC96633
)
STATE OF MISSOURI,           )
)
         Respondent.       )

*Opinion issued April 16, 2019*

### APPEAL FROM THE CIRCUIT COURT OF CARTER COUNTY
The Honorable Kelly W. Parker, Judge

Lance Shockley (hereinafter, "Movant") was found guilty by a jury of one count of first-degree murder for the death of Missouri highway patrolman Sergeant Carl DeWayne Graham, Jr. (hereinafter, "Victim"). The jury found the facts required by law to impose a death sentence, but it was unable to agree whether to recommend a sentence of death or life imprisonment. Pursuant to section 565.030.4, RSMo 2000,[1] the circuit court conducted an independent review of the facts and imposed a death sentence. This Court affirmed Movant's conviction and sentence. *State v. Shockley*, 410 S.W.3d 179 (Mo. banc 2013).

---

[1] All statutory references are to RSMo 2000 unless otherwise indicated.

Movant appeals the motion court's judgment overruling his Rule 29.15 motion after an evidentiary hearing. This Court has exclusive jurisdiction over this appeal because a death sentence was imposed. Mo. Const. art. V, sec. 10; *see also* Standing Order, June 16, 1988 (effective July 1, 1988). This Court affirms the motion court's judgment.

### Factual and Procedural History[2]

On November 26, 2004, Movant was involved in a motor vehicle accident resulting in the death of his passenger. Over the next several months, Victim conducted the investigation of the accident, which criminally implicated Movant.

On March 20, 2005, at approximately 12:20 p.m., Movant borrowed his grandmother's red Pontiac Grand Am (hereinafter, "the red car"), which had a bright yellow sticker on the trunk near the driver's side. Between 1:45 p.m. and 4:15 p.m. that afternoon, various witnesses noticed a red car with a bright yellow sticker affixed to the driver's side of the trunk parked on the wrong side of the road a few hundred feet from Victim's residence.

At 4:03 p.m. that day, Victim returned home, backed his patrol car into his driveway, and radioed dispatch he was ending his shift. As Victim exited his vehicle, he was shot from behind with a high-powered rifle that penetrated his Kevlar vest. The bullet severed Victim's spinal cord at the neck, immediately paralyzing him. Victim fell backward and suffered fractures to his skull and ribs upon impact with the pavement. The killer then approached Victim, who was still alive, and shot him twice more with a shotgun into his

---

[2] This recitation incorporates portions of this Court's prior opinion from Movant's direct appeal without further attribution or citation.

2

face and shoulder. The recovered rifle bullet was deformed, but ballistics experts determined it belonged to the .22 to .24 caliber class of ammunition that would fit a .243 caliber rifle. Investigators later learned that, around 7 p.m. on the evening of Victim's murder, Movant's wife gave Movant's uncle a box of .243 caliber bullets and stated, "[Movant] said you'd know what to do with them."

Movant returned the red car to his grandmother between 4:15 p.m. and 4:30 p.m. that same day. Investigators calculated it took approximately eighteen minutes to drive from Movant's grandmother's house to the location where the red car with the yellow sticker had been parked near Victim's home.

Two highway patrol investigators interviewed Movant at his residence that evening. Movant immediately denied killing Victim and stated he spent all day working around his house with his neighbor, Sylvan Duncan (hereinafter, "Sylvan").[3] The next day, Movant again met with investigators and elaborated on the alibi. Movant claimed he was visiting relatives, including his grandmother, and he watched from his living room as Sylvan pushed brush. Movant stated he knew Victim was investigating him for the fatal accident and, without prompting, declared he did not know where Victim lived.

Later that day, Movant visited his grandmother and instructed her to tell the police he had been home all day the day Victim was shot. When his grandmother told Movant she would not lie for him, he put his finger over her mouth and said, "I was home all day."

---

[3] Sylvan and his wife, Carol, will be referred to by their first names for ease of clarity. No disrespect is intended.

Police arrested Movant on March 23, 2005, for leaving the scene of the car accident that resulted in his passenger's death. The state subsequently charged Movant with leaving the scene of a motor vehicle accident, first-degree murder for Victim's death, and armed criminal action. The state proceeded to trial only on the first-degree murder charge and sought the death penalty. Movant was represented initially by several public defenders, including Thomas Marshall (hereinafter, "Marshall" and, collectively, "the first trial team"). Movant later obtained private counsel and was represented at trial by Brad Kessler ("hereinafter, "Kessler"), David Bruns (hereinafter, "Bruns"), and Mollyanne Henshaw (hereinafter, "Henshaw" and collectively, "trial counsel").

The state theorized Movant killed Victim to stop the fatal car accident investigation. Movant's defense was it was ridiculous for him to believe, simply by killing Victim, law enforcement would halt its investigation into the accident. Trial counsel also argued the police improperly directed all their investigative attention toward him rather than pursuing other possible perpetrators.

After a five-day guilt phase proceeding, the jury found Movant guilty of first-degree murder. During the penalty phase, the state submitted four statutory aggravators pursuant to section 565.032.2: (1) Victim was a "peace officer" and the "murder was committed because of the exercise of his official duty;" (2) Movant was depraved of mind when he killed Victim and, "as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman;" (3) Victim was murdered "for the purpose of avoiding ... or preventing a lawful arrest;" and (4) Victim was a "potential witness in [a] past or pending investigation ... and was killed as a result of his status as a ... potential witness."

4

The jury found the first, third, and fourth statutory aggravators were proven beyond a reasonable doubt. The jury did not find unanimously the circumstances in mitigation outweighed those in aggravation. However, the jury was unable to agree which punishment to recommend. After overruling Movant's motion for new trial, the circuit court imposed a death sentence pursuant to section 565.034.4.

Movant appealed and raised nine points of error. This Court affirmed the circuit court's judgment and conducted an independent proportionality review pursuant to section 565.035.3. Movant filed a timely Rule 29.15 motion for post-conviction relief, alleging several claims of ineffective assistance of trial and appellate counsel. After an evidentiary hearing, the motion court issued findings of fact and conclusions of law, made credibility determinations, and denied Movant relief. Movant now appeals, raising seventeen claims of error.

**Standard of Review**

This Court reviews the denial of post-conviction relief to determine whether the motion court's findings of fact and conclusions of law are clearly erroneous. Rule 29.15(k). "A judgment is clearly erroneous when, in light of the entire record, the court is left with the definite and firm impression that a mistake has been made." *Swallow v. State*, 398 S.W.3d 1, 3 (Mo. banc 2013). The motion court's findings are presumed correct. *Johnson v. State*, 406 S.W.3d 892, 898 (Mo. banc 2013). "This Court defers to 'the motion court's superior opportunity to judge the credibility of witnesses.'" *Barton v. State*, 432 S.W.3d 741, 760 (Mo. banc 2014) (quoting *State v. Twenter*, 818 S.W.2d 628, 635 (Mo. banc 1991)).

5

To be entitled to post-conviction relief for ineffective assistance of counsel, a movant must show by a preponderance of the evidence his or her trial counsel failed to meet the *Strickland* test to prove his or her claims. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Under *Strickland*, Movant must demonstrate: (1) trial counsel failed to exercise the level of skill and diligence reasonably competent trial counsel would in a similar situation, and (2) he was prejudiced by that failure. *Id.* at 687.

Movant must overcome the strong presumption trial counsel's conduct was reasonable and effective. *Johnson*, 406 S.W.3d at 899. To overcome this presumption, a movant must identify "specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." *Zink v. State*, 278 S.W.3d 170, 176 (Mo. banc 2009). Trial strategy decisions may be a basis for finding ineffective assistance of counsel only if that decision was unreasonable. *Id.* "[S]trategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable …." *Dorsey v. State*, 448 S.W.3d 276, 287 (Mo. banc 2014) (quoting *Strickland*, 466 U.S. at 690).

"To establish relief under *Strickland*, a movant must prove prejudice." *Johnson*, 406 S.W.3d at 899. Prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Deck v. State*, 68 S.W.3d 418, 429 (Mo. banc 2002) (quoting *Strickland*, 466 U.S. at 694). Prejudice in a death penalty case is "a reasonable probability that, but for counsel's deficient performance, the jury would have concluded the balance of aggravating and

6

mitigating circumstances did not warrant death." *Forrest v. State*, 290 S.W.3d 704, 708 (Mo. banc 2009) (quoting *State v. Kenley*, 952 S.W.2d 250, 266 (Mo. banc 1997)). Movant's points on appeal will be addressed out of order for clarity.

**Points I through IV – Juror 58**

Movant raises four points related to Juror 58's conduct during voir dire and while serving on the jury. Two months before serving on the jury, Juror 58 published a 184-page book, which he described as a fictionalized autobiography. The book contains six pages chronicling the protagonist's brutal and graphic revenge murder of a defendant who killed the protagonist's wife in a drunken-driving accident. The protagonist viewed the defendant as escaping justice in the court system because the defendant received only probation following his conviction. The book's front and back covers contain illustrations of blood spatter. The back cover states the protagonist's life changed forever when his wife was killed and her murderer was set free. The cover states the protagonist "sought vengeance" and "seeks justice" and "knows he will die fighting the system."

*Point I – Failure to Question Juror 58 during Voir Dire*

Movant argues the motion court clearly erred in denying his claim trial counsel were ineffective for failing to question Juror 58 when he volunteered he was a published author. Movant claims questioning Juror 58 about the book's contents would have uncovered grounds to strike him for cause. Movant claims he was prejudiced because the book's contents demonstrated Juror 58 could not serve fairly and should have been struck for cause.

7

A defendant has a constitutional right to a fair and impartial trial. U.S. Const. amends. VI, XIV; Mo. Const. art. I, sec. 18(a). This right includes "adequate voir dire to identify unqualified jurors." *Knese v. State*, 85 S.W.3d 628, 632 (Mo. banc 2002). "[A] veniremember should be asked if he or she holds any prejudices or biases that would 'prevent or substantially impair the performance of his [or her] duties as a juror in accordance with his [or her] instructions and his [or her] oath.'" *Id*. at 632 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 2526, 65 L. Ed. 2d 581, 589 (1980)). "This inquiry is meant to reveal whether a juror can set aside any prejudices and impartially fulfill his [or her] obligations as a juror." *Id.*; *Wainwright v. Witt*, 469 U.S. 412, 421-22, 105 S. Ct. 844, 850, 83 L. Ed. 2d 841, 851 (1985).

"A challenge for cause will be sustained if it appears that the venireperson cannot 'consider the entire range of punishment, apply the proper burden of proof, or otherwise follow the court's instructions in a first degree murder case.'" *State v. Smith*, 32 S.W.3d 532, 544 (Mo. banc 2000) (quoting *State v. Rousan*, 961 S.W.2d 831, 839 (Mo. banc 1998)). "In cases in which the death penalty may be imposed, a person who cannot be impartial due to an improper predisposition is unfit to serve on the jury." *Dorsey*, 448 S.W.3d at 299 (quoting *Anderson v. State*, 196 S.W.3d 28, 41 (Mo. banc 2006)). The fitness of a juror is considered in the context of the entire examination of the juror and not by focusing on one response. *Middleton v. State*, 103 S.W.3d 726, 734 (Mo. banc 2003).

Failure to strike a juror who is unfit to serve because of an improper predisposition is structural error. *Anderson*, 196 S.W.3d at 40. When a "defendant is deprived of the right to a fair and impartial jury, prejudice therefrom is presumed." *Strong v. State*,

8

263 S.W.3d 636, 647 (Mo. banc 2008) (quoting *Everage v. State*, 229 S.W.3d 99, 102 (Mo. App. W.D. 2007)). "Nonetheless, in order to avail himself of this presumption, [Movant] must establish that the errors complained of resulted in his trial by a jury that was not fair and impartial." *Id*.

During the death qualification voir dire, Juror 58 stated he could give meaningful consideration to returning any appropriate sentence if the jury reached that point in the proceedings. Juror 58 approached the bench during a break to inform the circuit court he failed to mention his son was a Springfield police officer and he was a published author. When trial counsel asked the venire panel whether they had family members in law enforcement, Juror 58 spoke about his son but stated it would not affect his ability to be fair in this case. Neither party questioned Juror 58 about being an author.

Juror 58 was chosen for the jury and served as the foreman. The jury returned a guilty verdict. That evening, Movant's aunt provided trial counsel with a copy of Juror 58's book. Kessler reviewed the book overnight and presented arguments concerning Juror 58's fitness to serve as a juror the next day.

Kessler read excerpts into the record and argued the excerpts demonstrated Juror 58 was not truthful when he answered questions during voir dire. Kessler asked the circuit court to question Juror 58 on the record about the book's contents and his personal beliefs. Kessler also requested the circuit court question all of the jurors about any effect Juror 58's personal beliefs and opinions had on jury deliberations. The circuit court denied the request to question Juror 58 because it found no evidence of juror misconduct and believed questioning Juror 58 might improperly taint the whole jury. Kessler then moved for a

9

mistrial, arguing he would have to concede ineffectiveness for failing to inquire about the book during voir dire. The circuit court overruled the motion but advised Movant he could question the jurors, if necessary, after the trial. Juror 58 later was removed from the jury by the consent of the parties and did not participate in the penalty phase.

In his motion for new trial, Movant argued the circuit court erred in failing to declare a mistrial after the book's contents were revealed. Movant alleged Juror 58 failed to disclose he wrote a book about the criminal justice system. Movant further alleged Juror 58 failed to inform the circuit court during voir dire he believed the court system was weak and vigilante justice was an appropriate remedy. Movant argued the book constituted evidence Juror 58 was not completely truthful about his views about the death penalty and his experiences with the criminal justice system. The circuit court overruled Movant's motion.

On direct appeal, Movant argued the circuit court should have sustained his motion for a mistrial or motion for new trial because the book's contents were so close to the facts of Movant's case and revealed such an inherent bias it must have meant Juror 58 lied during voir dire when he stated he could be fair and impartial. *Shockley*, 410 S.W.3d at 199. Movant further claimed Juror 58's experiences and beliefs, as illuminated in his book, likely were influential upon the other jurors. *Id*. This Court found Movant's argument without merit, first noting none of the parties asked Juror 58 any questions about his book during voir dire, even after Juror 58 volunteered he was a published author. *Id*. at 200. Hence, Juror 58 could not have lied in response to a question he was not asked. *Id*. This Court further found:

10

While the nature of the novel's subject matter caused the court concern, the court determined that nothing in the record demonstrated that Juror 58 lied when he said he could be fair and impartial or that he was willing but reluctant to impose the death penalty. [Movant's] argument to the contrary is premised on a degree of factual congruity between the novel and the facts of the trial that does not exist. Further, [Movant's] argument that Juror 58's assurance of his impartiality was false is premised on the assumption that Juror 58 shared the views expressed by the protagonist in his novel and tried to hide that fact from the court and counsel so that he could be seated on the jury. This is inconsistent with the fact that it was Juror 58 himself who brought his book, and his son's police work, to the attention of the court and counsel so they could include these issues in their remaining line of questions.

*Id*. at 200-01 (footnote omitted).

At the post-conviction evidentiary hearing, Juror 58 testified he was excited about having his first book published, and he brought at least four copies with him to the hotel. Juror 58 described the book as "a love story" with themes in which "[s]ome of them are very violent, some are heart rendering, some will make you laugh, some will make you cry and some will make you feel anger." Juror 58 admitted many of the chapters were filled with his own true life experiences or those of someone he served with in the military. Juror 58 described the book as a fictionalized autobiography, but he denied the graphic contents happened to him. Juror 58 went into great detail outlining which plot points were based on his personal experience and which ones were fictionalized. Juror 58 was questioned extensively about the book's themes and disavowed he personally held any of those ideas because it was not his personal belief the court system was not good. Further, he denied relating or expressing the book's themes to other jurors. Juror 58 was adamant the book had no bearing on his decision and no bearing on anyone else as far as he knew. Juror 58 said it became clear to him Movant was guilty only after his grandmother testified.

11

Bruns testified one of his concerns during voir dire was to weed out potential jurors who were so pro-law enforcement they could not be fair. When Juror 58 mentioned his son was a police officer and he was a published author, Bruns' attention was drawn to the fact he had a law enforcement family member.

Kessler admitted Juror 58 was not asked any follow-up questions after he revealed he was a published author. Kessler explained, "[O]ne of the reasons I didn't ask any further questions at the time because, I mean, in 2008, '09, '10, self-publishing just sort of meant that … it was a vanity project" and the book was not distributed widely.[4] Because the central issue concerned contradictory ballistics evidence, Kessler did not see a problem with Juror 58 being a self-published author or see a reason to question him about it. Instead, Kessler testified he noticed Juror 58 had some military experience, his son was a police officer, and they both had knowledge about guns. Kessler remembered conceding ineffective assistance of counsel for failing to follow up with Juror 58 after reading the book at trial and stated he never stated that on the record before. Kessler explained he said

---

[4] This testimony refutes the dissenting opinion's claim trial counsel had no valid strategic reason for failing to question Juror 58 about being an author. Further, the dissenting opinion would have this Court adopt a rule that a potential juror's employment as an author, standing alone, establishes the juror has "multiple sources of bias," which must be explored for trial counsel to conduct an effective voir dire. However, this proposed rule is based solely upon having the benefit of hindsight regarding the contents of Juror 58's novel. The dissenting opinion cannot point to any of Juror 58's voir dire testimony that revealed "multiple sources of bias" simply from Juror 58's status as a published author. Accordingly, there was nothing to prompt trial counsel's further exploration, especially when also presented with Juror 58's knowledge about guns and his son's law enforcement background, which were germane to the case.

he was ineffective to try to force the circuit court to allow trial counsel to question Juror 58 about the book or remove him from the jury. Kessler testified had he asked follow-up questions about the book, he would have moved to strike Juror 58 for cause.

The motion court found it was reasonable for trial counsel to focus their attention on Juror 58's relationship with his police officer son and the impact that might have had on his ability to be a fair and impartial juror rather than on Juror 58's participation in a hobby or profession that had no bearing on his suitability as a juror in this particular case. This Court agrees.

Trial counsel articulated strategic reasons why they chose not to question Juror 58 about being a published author. Trial counsel explained the case involved the murder of a law enforcement officer and contradictory ballistics evidence. Trial counsel questioned Juror 58 regarding his son being a police officer and his knowledge of guns, which were crucial parts of their trial strategy in selecting jurors and in presenting their theory of the case. "It is not ineffective assistance of counsel for an attorney to pursue one reasonable trial strategy to the exclusion of another, even if the latter would also be a reasonable strategy." *Clayton v. State*, 63 S.W.3d 201, 207-08 (Mo. banc 2001).[5]

---

[5] Movant argues his case is akin to *Knese*, in which trial counsel was found ineffective after admitting he wholly failed to read the juror questionnaires revealing strong opinions about the death penalty prior to voir dire. *Knese*, 85 S.W.3d at 632-33. *Knese* does not aid Movant's argument. While trial counsel did not question Juror 58 about his book, trial counsel were aware of Juror 58's status as an author but chose to forego that line of questioning in favor of implementing their reasonable trial strategy of uncovering pro-law enforcement bias and helpful knowledge about firearms.

Movant also attacks Juror 58's veracity due to his characterization of the book as "a love story" in the face of its graphic nature criticizing the criminal justice system. After careful review of the book, Juror 58 accurately described the overall storylines within the book as "[s]ome of them are very violent, some are heart rendering, some will make you laugh, some will make you cry and some will make you feel anger." However, even if this Court rejected Juror 58's primary characterization of his book as "a love story," mere authorship of a book expressing unfavorable views of the justice system over the course of six pages does not prove Juror 58 personally held the beliefs espoused in his book rendering him unfit to serve on the jury. It is worth noting this Court found in Movant's direct appeal "*a degree of factual congruity between the novel and the facts of the trial* [*did*] *not exist.*" *Shockley*, 410 S.W.3d at 200-01 (emphasis added).

Although Kessler admitted he was ineffective for failing to question Juror 58 about being an author, the record does not support a finding that, had Kessler discovered the book's contents and questioned Juror 58 about them that Juror 58 would have been struck for cause absent some showing the book reflected his personal beliefs. Juror 58 stated during voir dire he could be fair and impartial in a case in which a law enforcement officer was killed because he "has his own mind" in listening to the facts. At the evidentiary hearing, Juror 58 testified he did not hold the personal beliefs in the book. Movant presented no evidence to contradict Juror 58's testimony. Hence, Movant cannot demonstrate he was prejudiced by trial counsel's failure to question Juror 58 about the book. *See Glass v. State*, 227 S.W.3d 463, 474 (Mo. banc 2007) (holding although trial counsel testified it was a mistake to forego questioning the venire panel, the movant could

14

not prove prejudice because he made no showing the jurors were unable or unwilling to consider the evidence presented in light of their testimony they were willing to follow the circuit court's instructions). The motion court did not err in denying this claim.

*Point II – Failure to Present Witnesses at Motion for New Trial Hearing Regarding Alleged Juror Misconduct*

Movant alleges the motion court clearly erred in denying his claim trial counsel were ineffective for failing to call witnesses at the motion for new trial hearing to demonstrate how Juror 58's actions constituted prejudicial juror misconduct and violated the circuit court's directive regarding reading materials while sequestered. Movant alleges trial counsel should have called jurors, court personnel, and the trial judge—after seeking his disqualification—when invited to do so by the circuit court to prove this allegation.

Movant can prevail on a claim for ineffective assistance of counsel based on trial counsel's alleged failure to investigate only if he can demonstrate: (1) trial "counsel's failure to investigate was unreasonable" and (2) Movant "was prejudiced as a result of [trial] counsel's unreasonable failure to investigate." *Barton*, 432 S.W.3d at 759. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Collings v. State*, 543 S.W.3d 1, 16 (Mo. banc 2018) (quoting *Strickland*, 466 U.S. at 691, 104 S. Ct. 2052).

On March 30, 2009, the circuit court entered an order, contemplating a hearing may be required to present additional testimony, evidence, and arguments by the parties regarding Juror 58's conduct. To avoid the appearance of impropriety, the circuit court

15

ordered "no member of the jury, including all alternates, shall discuss any matter regarding this case with any person, and no one shall be permitted to discuss any matter with them (all jurors and alternates)."

On April 22, 2009, Movant filed his motion for new trial, which contained sixteen claims of trial court error. The motion alleged the circuit court erred in refusing trial counsel's request to hold a hearing to question Juror 58 about the book's contents and his beliefs. The motion further argued the circuit court erred in refusing trial counsel's request to hold a hearing to question all of the jurors about the effect Juror 58's personal beliefs and opinions had on the jury's guilt phase deliberations.

On April 29, 2009, the circuit court issued a letter to the attorneys stating, "I want to determine whether the state or [Movant] will be requesting (or subpoenaing) any juror in this case to testify about any issue raised at trial or in pending motions." The circuit court advised the attorneys to make arrangements for a conference if either side planned to question any juror at the post-trial hearing. On May 22, 2009, the circuit court held the hearing on Movant's motion for new trial. Kessler stated the defense did not intend to call any additional witnesses, including Juror 58.

On direct appeal, Movant argued the circuit court committed reversible error for failing to conduct its own inquiry sua sponte into whether extraneous information or prejudicial materials were part of the jury's deliberations. This Court found Movant's claim without merit, stating, "Not only did neither counsel take the judge up on this offered opportunity to question Juror 58 about whether he had discussed his novel with other jurors, defense counsel specifically waived any right to such a hearing." *Shockley*, 410 S.W.3d at

16

201. Because trial counsel affirmatively waived the opportunity to call witnesses, this Court refused to speculate whether Juror 58 shared his book's themes or viewpoints with other jurors or whether he lied during voir dire about being fair and impartial. *Id.*

At the evidentiary hearing, Kessler testified he was not allowed to contact the jurors prior to filing the motion for new trial because of the March 30, 2009, order. Bruns testified the circuit court indicated it would hold a conference and let trial counsel subpoena jurors, which they discussed but did not do.

Even if this Court believes trial counsel should have taken up the circuit court's invitation to hold a hearing on Juror 58's alleged misconduct, this belief alone is insufficient to find trial counsel ineffective. "The question in an ineffective assistance claim is not whether counsel could have or even, perhaps, should have made a different decision, but rather whether the decision made was reasonable under all the circumstances." *Johnson*, 406 S.W.3d at 901 (quoting *Henderson v. State*, 111 S.W.3d 537, 540 (Mo. App. W.D. 2003)). "Reasonable choices of trial strategy, no matter how ill-fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance." *Anderson*, 196 S.W.3d at 33. "Ineffective assistance of counsel will not lie where the conduct involves the attorney's use of reasonable discretion in a matter of trial strategy, and it is the exceptional case where a court will hold a strategic choice unsound." *State v. White*, 798 S.W.2d 694, 698 (Mo. banc 1990).

This case does not present the exceptional case requiring a finding trial counsel were ineffective in failing to present witnesses on this issue. Trial counsel both testified, after the jury could not agree on punishment, they believed they were in a better position to

17

argue for a life sentence, which would be the ultimate goal for any reasonable trial counsel after the jury's guilty verdict. Kessler testified he considered it a victory that the jury could not agree on punishment in light of everything that transpired. Bruns testified the trial judge had "been good" to them during the trial and believed—perhaps naively—that not "opening the can of worms" regarding the juror misconduct issue would inure to Movant's benefit. Finally, Kessler had significant trial experience and never had a trial judge impose a death sentence after the jury could not agree on punishment in cases he tried. Even though trial counsel's strategy failed in hindsight, the record clearly demonstrates trial counsel evaluated their options, drew upon their experience, and chose to forego "opening the can of worms" regarding Juror 58's alleged misconduct in exchange for attempting to persuade the circuit court to impose a life sentence to save Movant's life. Trial counsel's decisions were reasonable under all of the circumstances. The motion court did not clearly err in denying this claim.

*Point III – Circuit Court's Timely Disclosure Regarding Juror 58's Book*

Movant argues the motion court clearly erred in denying his claim the circuit court failed to timely disclose Juror 58 brought his book to the sequestered jury. Movant argues the circuit court had an affirmative duty to apprise trial counsel of Juror 58's misconduct in a timely fashion. By failing to apprise counsel timely, Movant argues he was deprived of an opportunity to demonstrate prejudice warranting a mistrial or ordering a new trial.

In the April 29, 2009, letter, the circuit court informed the attorneys, "[R]egarding the 'book' referred to at trial, I have been advised that the same juror gave a copy of his book during the week of trial to the [sheriff]." At the motion for new trial hearing, Kessler

18

stated the parties were unaware the circuit court had a copy of the book until he received the April 29, 2009, letter, which was after the motion for new trial was due. The circuit court explained the sheriff brought in the book after the guilty verdict and gave it to his administrative assistant. The circuit court stated, "At that time I didn't know what the books was or its contents …. It was after the argument that I realized that it was the same book." The circuit court later confirmed it did not receive the book until after the guilty verdict was returned.

At the evidentiary hearing, the trial judge testified that, when the parties appeared the morning after the guilty verdict to discuss Juror 58's book, he did not know if he told the attorneys he received a copy of the book. The trial judge did not remember having a conversation with court personnel about the book. The trial judge also did not remember if the April 29, 2009, letter was the first time he informed the parties he had received a copy of the book during the trial.

Bruns and Kessler testified they did not know the trial judge had a copy of the book before they brought it to his attention, and they were told nothing until the April 29, 2009, letter. Kessler stated this constituted another ground to examine Juror 58 because he violated the circuit court's directive not to bring anything crime-related to the trial. Kessler testified he would have included this allegation in the motion for new trial had he known the circuit court had a copy of the book.

The motion court found Movant merely established the trial judge had the ability to know about the book prior to trial counsel addressing the issue. The motion court found

19

Movant failed to prove any misconduct or prejudice from the trial judge's actions in violation of his constitutional rights.

Initially, this Court notes Movant's point on appeal raises different legal arguments than those presented for the motion court's consideration in his Rule 29.15 motion. Movant's motion alleged the trial judge failed to disclose timely he learned before the guilt phase deliberations Juror 58 had given the book to the sheriff and the trial judge questioned the sheriff about the book. Movant's motion further accused the trial judge of: (1) considering information not on the record; (2) prejudging the issue by considering the statements from the sheriff and other court personnel regarding the book; and (3) failing to recuse himself. Movant's motion does not allege the trial judge failed to disclose Juror 58 brought his book to the sequestered jury.

"In actions under Rule 29.15, any allegations or issues that are not raised in the Rule 29.15 motion are waived on appeal." *Johnson v. State*, 333 S.W.3d 459, 471 (Mo. banc 2011) (quoting *State v. Clay*, 975 S.W.2d 121, 141-42 (Mo. banc 1998)). "Pleading defects cannot be remedied by the presentation of evidence and refinement of a claim on appeal." *Id*. Moreover, "there is no plain error review in appeals from post-conviction judgments for claims that were not presented in the post-conviction motion." *McLaughlin v. State*, 378 S.W.3d 328, 340 (Mo. banc 2012). To the extent Movant now claims the circuit court failed to timely disclose Juror 58 brought his book to the sequestered jury, his claim is not preserved for appeal, nor is it supported by the record. Movant does not raise any of the other grounds from his Rule 29.15 amended motion and

20

specifically disavows his claim concerns ex parte communications.[6] The motion court did not clearly err in denying this claim.

*Point IV – Juror Misconduct by Violating the Circuit Court's Directive*

Movant argues the motion court clearly erred in denying his claim Juror 58 committed juror misconduct and violated the circuit court's directive regarding bringing his book to the sequestered jury and sharing it with the other jurors. Movant argues Juror 58's book prejudiced his ability to receive a fair trial in that its violent storyline espoused the need for vengeance because the court system was "too lenient" with criminal defendants accused of homicide offenses.

"Issues that could have been raised on direct appeal—even if constitutional claims—may not be raised in postconviction motions, except where fundamental fairness requires otherwise and only in rare and exceptional circumstances." *State v. Tolliver*, 839 S.W.2d 296, 298 (Mo. banc 1992); *State v. Carter*, 955 S.W.2d 548, 555 (Mo. banc 1997). Generally, juror misconduct constitutes trial error and is outside the scope of post-conviction relief proceedings. *Eye v. State*, 551 S.W.3d 671, 677 (Mo. App. E.D. 2018). "[A] juror misconduct claim amounting to a constitutional error can only be raised in a Rule 29.15 motion when the factual basis of the juror misconduct was not discovered until after the trial." *Id.*

---

[6] Further, even if Movant's point on appeal could be read to encompass this claim, the circuit court's acts or omissions did not prohibit trial counsel from developing a record regarding Juror 58's dissemination of his book to the other jurors. The circuit court provided trial counsel with an opportunity to develop this evidence at the hearing on the motion for new trial. Trial counsel chose to forego this line of inquiry in hopes of strengthening their argument for a life sentence for Movant.

21

Movant cites *McQuarty v. State*, 241 S.W.3d 446 (Mo. App. W.D. 2007), to support his argument this claim is cognizable because rare and exceptional circumstances require its review due to Movant's fundamental right to a fair and impartial jury in a death penalty case. In *McQuarty*, a juror intentionally failed to disclose a significant social relationship with the state's principal witness, and the movant raised this claim for the first time in his Rule 29.15 motion. *Id*. at 450. The Western District found the movant had not been afforded an opportunity to litigate the claim and held, "Given the unique posture of this case, we conclude that [the movant's] post-conviction motion establishes exceptional circumstances that have prevented him from asserting a claim of constitutional error that may have deprived him of a fair trial." *Id*. at 454.

In this case, Movant had an opportunity to litigate this claim during the hearing on his motion for new trial. However, trial counsel declined to raise the issue in hopes of strengthening their argument for a life sentence for Movant. Further, Movant raised issues related to this claim on direct appeal, arguing he suffered prejudice because Juror 58 may have improperly influenced other jurors by speaking about the book's contents, which he believed impacted the verdict. *Shockley*, 410 S.W.3d at 199-200. This Court found no basis for reversal was demonstrated because it would not speculate about Juror 58's actions or influences when trial counsel declined to question Juror 58 at the hearing on Movant's motion for new trial. *Id*. at 201-02.

While the state agrees Movant could have presented this claim in his direct appeal, it cites *Jackson v. State*, 538 S.W.3d 366 (Mo. App. W.D. 2018), as authority for this Court to deny Movant's claim on the merits. In *Jackson*, the Western District relied on *McQuarty*

22

to require the movant to demonstrate rare and exceptional circumstances exist justifying raising a claim of juror misconduct in a Rule 29.15 proceeding when the misconduct was not discovered until after the trial. *Id*. at 370. The court found the movant failed to allege facts demonstrating when the juror's alleged misconduct was discovered, which would make his claim noncognizable. *Id*. at 370-71. Nevertheless, the Western District reviewed the claim on the merits, explaining, "[A]s the circuit court granted [the movant] an evidentiary hearing on the claim, denied the substantive claim, and this [c]ourt agrees that the substantive juror misconduct claim must also fail on the merits, we will also address the substance of [the movant's] juror misconduct claim." *Id*. at 371. Likewise, this Court will address the merits of Movant's claim only because it presents the same procedural posture as *Jackson* in that the motion court heard evidence on the issue, denied the substantive claim, this Court agrees the claim fails on the merits, and it raises a challenge to the propriety of Movant's capital murder guilty verdict.

In this point, Movant alleges Juror 58 committed intentional juror misconduct and violated the circuit court's directive about bringing his book to the sequestered jury and sharing it with the other jurors. "This Court presumes bias and prejudice occurred if a juror intentionally withholds material information. Accordingly, a finding of intentional nondisclosure of a material issue is tantamount to a *per se* rule mandating a new trial." *State v. Ess*, 453 S.W.3d 196, 205 (Mo. banc 2015) (internal citation omitted).

Movant incorporates and repeats many of the same arguments concerning Juror 58's conduct he raised in his first three points. The issue remains whether Juror 58 intentionally disregarded the circuit court's directive concerning bringing certain personal materials

23

while sequestered and to what extent, if any, Juror 58's conduct prejudiced Movant's right to a fair trial.

The jury was sequestered during trial. The circuit court appointed a jury coordinator to assist the jurors during sequestration. The jury coordinator prepared a jury information packet, which the parties were invited to review for any objectionable material. Trial counsel requested the jury should not have "crime stories, CSI-kind of things that lead them to believe … we should have to come up with … these extraordinary defenses and alibis - - or that the [s]tate has to come up with this extraordinary scientific evidence." As part of a lengthy discussion regarding what to expect during sequestration, the circuit court gave the following directive to the jury:

> You will be able to bring books with you, even movies with you, to trial. The cautionary note on there, the only one the attorneys ask that I mention, avoid movies and books about trials, particularly periodicals or legal documents. That's normally something, again, the law has to be supplied by the judge, not due to your independent research and investigation. So general movies, avoiding crime shows and issues of that nature.

Movant offered testimony from several jurors and court personnel at the evidentiary hearing regarding their interactions with Juror 58 and his book. Juror 3 testified Juror 58 gave him his card, which stated Juror 58 was the book's author. Juror 3 asked Juror 58 about being an author, and Juror 58 said he wrote a book and had it with him. Juror 3 looked at the book, read the back cover, and returned it. Juror 3 never saw other jurors with a copy of the book or reading the book.

Juror 50 testified Juror 58 gave her a copy of his book. Juror 50 read two or three pages but "there was something that made [her] think maybe [she] shouldn't be reading this" and she returned the book to Juror 58.

Juror 117 and her husband operated a gift shop specializing in Native American items. Juror 58 visited their shop several weeks before the trial and spoke with Juror 117's husband about possibly carrying the book in the shop. After Juror 117 arrived at the courthouse to serve on the jury, her husband gave her a copy of Juror 58's book. Juror 117 put the book in her backpack, and she pulled it out later that evening. Juror 117 read the introduction, skimmed through the book, and put it away because she was too tired to read. Juror 117 testified she never looked at the book again during the trial. Juror 117 stated, if she had read the back of the book before putting it in her backpack, she would not have brought it with her because she thought it fell under the circuit court's directive not to bring books about trials or crimes.

A Howell County sheriff testified he was the supervisor of court security for the courthouse where Movant's trial took place. After a day in court, Juror 58 approached the sheriff at the hotel, talked to him about writing a book, and asked the sheriff if he wanted to read it. Juror 58 gave the sheriff a copy of the book. The sheriff testified he either read or glanced at the forward. The sheriff was concerned and brought the book's contents to the circuit court's attention through the court's administrative assistant. The sheriff testified the circuit court questioned him approximately an hour after he gave the book to the administrative assistant. The sheriff did not see any other copies of the book. The sheriff never heard the jurors talking about writing a book or publishing a book.

25

The administrative assistant testified she did not remember how the book came into the circuit court's chambers, but the sheriff received the book from Juror 58. The administrative assistant described the book as "fairly graphic in some of its content."

The jury coordinator testified that shortly after being chosen for the jury, Juror 58 approached her and asked her if she liked to read. Juror 58 told her he wrote a book and handed her a copy. The jury coordinator noted Juror 58 was proud to have written the book, so she took a copy, put it in her bag, but never opened or read it. The jury coordinator did not see other copies of the book during the week of the trial nor did she observe Juror 58 give the book to anyone else. The jury coordinator was called into the trial judge's chambers after trial counsel raised the issue regarding the book's dissemination to other jurors. The trial judge spoke to her about the alternate jurors but did not question her about the book.

The trial judge testified he did not see a copy of the book until after the jury reached its guilty verdict, and he believed his administrative assistant placed it on his desk before she left for the day. The trial judge stated he glanced at the book, intended to return the book to Juror 58, and planned to speak to the trial attorneys about the book the next morning. Trial counsel met in the trial judge's chambers the next morning to discuss removing Juror 58. The trial judge did not know if any of the attorneys saw the book on his desk.

Juror 58 admitted he gave copies of his book to Juror 3, the sheriff, the jury coordinator, and possibly one other female juror. Juror 58 handed the copies out at night after the jury returned to the hotel. Juror 58 did not remember the circuit court telling them

26

to avoid bringing books about trial and crimes with them. After being read the circuit court's directive, Juror 58 felt he complied because his book was not about jury trials, but was "a love story" with only one chapter about the courts.

The motion court found the circuit court's directive did not have the same legal significance as a Missouri Approved Instruction (hereinafter, "MAI"). The motion court further determined the evidence did not establish intentional misconduct but "at most a miscommunication about what the court intended." Movant argues these findings trivialize and demean the circuit court's directive because it was intended to ensure the jurors complied with other MAIs related to the jury's duty to determine the facts only from the evidence presented in court.

The motion court found the trial court's directive was similar to the informational pamphlet given to the jurors in *State v. Storey*, 901 S.W.2d 886 (Mo. banc 1995). In *Storey*, the defendant argued the circuit court plainly erred in distributing an information pamphlet—which he equated to jury instructions—to the jury and argued trial counsel was ineffective for failing to object to it. *Id*. at 892. This Court explained the informational pamphlet was not an instruction because "[a] jury instruction is a 'direction given by the judge to the jury concerning the law of the case.'" *Id*. (quoting *Black's Law Dictionary* 856 (6th ed. 1990)).

In this case, trial counsel sought the directive to prevent the jurors from being exposed to materials that would cause them to require the parties to put on "these extraordinary defenses and alibis -- or that the [s]tate has to come up with this extraordinary scientific evidence" instead of being guided by the evidence and instructions presented.

27

The circuit court's lengthy discussion about how sequestration would work and its directive regarding what jurors could bring with them did not amount to formal jury instructions concerning the law of the case. Moreover, even taking into account the very limited exposure three jurors had to the book, nothing in the book can be construed as requiring either of the parties to put on extraordinary defenses, alibis, or scientific evidence, and Movant does not argue as such.

Movant argues it is irrelevant whether Juror 58's conduct constituted intentional misconduct because Juror 58's conduct and the book's alleged influence over the other jurors is akin to those in *State v. Post*, 804 S.W.2d 862 (Mo. App. E.D. 1991) (*overruled on other grounds by State v. Carter*, 78 S.W.2d 786, 789 n.5 (Mo. App. E.D. 2002)). In *Post*, the Eastern District reversed a first-degree murder conviction due to juror misconduct and law enforcement officers' outrageous conduct. *Id*. at 863. The evidence adduced demonstrated: (1) unauthorized deputies socialized with the sequestered jurors by playing cards, drinking beer, and one deputy commented about the case; (2) a police officer not assigned to or connected with the case socialized with the jurors and ate dinner with them while dressed in her uniform; (3) an unauthorized deputy had sexual contact with an alternate juror; and (4) a deputy assigned to the jury boasted to other members of the sheriff's department he was having sex with a jury member. *Id*. at 862-63. The trial court found "the jury was denied the opportunity and ability to act as a sequestered jury [because the jurors] were distracted from 'due and fair consideration of the facts'" and the verdict did not command confidence because it "was replete with suspicion of improper bias." *Id*.

28

at 863. The Eastern District concluded, "No one should be on trial for any crime, much less murder, in such a lackadaisical atmosphere." *Id*.

Movant's assertion Juror 58's conduct was more egregious than the jurors' conduct in *Post* due to his book's vengeance theme is unpersuasive. Unlike the jurors in *Post,* three jurors had very fleeting exposure at best, to Juror 58's book over the course of a week-long sequestration. Juror 58 denied any discussion took place with any of the jurors about the book's themes. This testimony is corroborated by the other jurors and court personnel. None of the jurors read the book in its entirety. Rather, the jurors testified they read a few pages from the introduction or skimmed the cover and refrained from any further exposure due to their belief it fell within the circuit court's directive. The sheriff and jury coordinator both testified they never saw any juror with the book or saw them reading or heard them discussing the book. There was no evidence any of the jurors read the pertinent parts of the book concerning the criminal case, the defendant's lenient sentencing, or the graphic description of how the protagonist avenged his wife's murder. Hence, there was no evidence the sequestered jury was distracted by the book to the point it could not give due and fair consideration of the facts, thus distinguishing this case from *Post*.

"While every party is entitled to a fair trial, as a practical matter, our jury system cannot guarantee every party a *perfect* trial." *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 87 (Mo. banc 2010). While the circuit court's directive did not amount to a formal jury instruction, this case illustrates how a lay juror may misunderstand or misinterpret the parameters of acceptable materials to bring while sequestered. When trial counsel sought to question Juror 58 about his conduct, the circuit court denied the request

29

because it found no evidence of juror misconduct. "As the trial court presides over the entirety of a trial, it is familiar with the circumstances surrounding a juror's misconduct. Accordingly, it is in the best position to determine what effect, if any, juror misconduct may have had on a jury's verdict." *Smotherman v. Cass Reg'l Med. Ctr.*, 499 S.W.3d 709, 710-11 (Mo. banc 2016). Further, this Court determined on direct appeal Juror 58 did not intend to conceal his status as an author or hide the contents of his book, as he explicitly brought this fact to the attention of the circuit court and trial counsel. *Shockley*, 410 S.W.3d at 201. The record supports the motion court's finding Juror 58's conduct amounted to a miscommunication about what was appropriate rather than intentional misconduct.

Even if Movant's trial was not perfect due to Juror 58 bringing his book to the sequestered jury, the motion court did not err in finding Movant suffered no prejudice. On direct appeal, this Court found nothing in the trial record supported the argument Juror 58 lied about being able to be fair and impartial, or he was willing but reluctant to impose the death penalty. *Shockley*, 410 S.W.3d at 200. Movant has not adduced any evidence contradicting this finding. Further, this Court rejected the idea Juror 58's assurances of impartiality were false because Movant assumed Juror 58 shared the views expressed by the protagonist in his book and tried to hide that fact from the court and trial counsel so he could be seated on the jury. *Id*. at 201. Juror 58 expressly disavowed he personally held the protagonist's views, and again, Movant offered no evidence to the contrary.[7]

---

[7] The dissenting opinion does not analyze whether Juror 58 committed juror misconduct by merely bringing his book to the sequestered jury nor does it argue the motion court's judgment was clearly erroneous in that regard. The dissenting opinion further speculates Juror 58's book "could have affected the jury's inability to decide on punishment," but it

Finally, when conducting proportionality review on direct appeal, this Court rejected Movant's argument his death sentence was excessive because the underlying verdict was based on circumstantial evidence and the jury deadlocked on punishment. This Court found when summarizing the evidence, the circumstantial evidence was strong and his sentence was proportionate. *Shockley*, 410 S.W.3d at 203-04. The record supports the motion court finding there was no evidence the jurors' momentary exposure to Juror 58's book had any influence on the individual jurors, their deliberations, or their verdict. The motion court did not clearly err in denying this claim.

### Point XI – Failure to Strike Juror 3

Movant claims the motion court clearly erred in denying his claim trial counsel were ineffective for failing to move to strike Juror 3, who Movant alleges was more inclined to impose a death sentence in a case involving the killing of a law enforcement officer. Movant contends Juror 3 was impaired substantially as to his ability to consider life and reasonably competent counsel would have moved to strike Juror 3 for cause. Movant argues prejudice is presumed but further alleges he was prejudiced because he did not have a full panel of jurors who could consider a life sentence.

"[A] person who cannot be impartial due to an improper predisposition is unfit to serve on the jury." *Dorsey*, 448 S.W.3d at 299 (citing *Anderson*, 196 S.W.3d at 41). "A prospective juror may be excluded for cause only if the juror's views would prevent or

---

fails to cite any evidence to support this supposition or to refute any of the testimony offered by all of the jurors that the book had no influence on their deliberations.

substantially impair the performance of his or her duties as a juror in accordance with the instructions and oath." *Middleton*, 103 S.W.3d at 734.

During the death qualification voir dire, Juror 3 stated he would not consider sentencing until after the verdict. Juror 3 was asked, "Does the fact [Victim] … has the status of a law enforcement officer then change your deliberation in the second stage? Would you say that you automatically would be more inclined to give the death penalty simply because it was the murder of a law enforcement officer?" Juror 3 answered, "I probably would be more inclined." Kessler explained the state had to prove an aggravating circumstance existed beyond a reasonable doubt during the penalty phase and a finding Movant killed Victim would prove one aggravating circumstance beyond a reasonable doubt. Juror 3 stated, "I respect law officers and what they have to do. I guess I would feel that's more of a crime than just an average --." Kessler responded, "Okay. And that's fair."

Kessler later asked Juror 3 if he was "more inclined to say that the person deserves the death penalty, and, therefore, that's the only punishment you're going to give meaningful consideration to?" Juror 3 answered, "I can't say that I would be more inclined because it would bother me. I respect law officers, but, I mean, I could be impartial." Kessler reiterated, "You would consider that as an aggravating circumstance, but it wouldn't automatically make you vote for the death penalty?" to which Juror 3 responded, "No, it would not." Juror 3 stated he would stand up to law enforcement or Victim's family and friends and base the verdict on the evidence in this case.

32

Neither Bruns nor Kessler had any recollection of Juror 3 or why they chose not to strike him. The motion court found no evidence in the record suggested a motion to strike Juror 3 would have been successful because his voir dire testimony was clear he could be impartial on the issue of punishment.

When examining the entire context of Juror 3's statements, this Court cannot say trial counsel were ineffective for failing to seek to strike him for cause. While Juror 3 initially stated he "would probably be more inclined" to vote for the death penalty, subsequent questioning revealed he could be impartial and would follow the circuit court's instructions. Juror 3 stated he would not only consider the death penalty for murdering a law enforcement officer, he could be impartial, and he would be able to stand up to law enforcement and Victim's family if the verdict did not include the death penalty. Hence, the record does not demonstrate Juror 3 would not consider the entire range of punishment, apply the proper burden of proof, or otherwise follow the circuit court's instructions. Trial counsel were not ineffective for failing to move to strike Juror 3. The motion court did not clearly err in denying this claim.

### Point V – Failure to Call a Ballistics Expert

Movant argues the motion court clearly erred in denying his claim trial counsel were ineffective for failing to call Steven Howard (hereinafter, "Howard") to testify as a ballistics expert on his behalf. Movant alleged Howard would have testified a Browning .243 rifle could not have fired the fatal shot that killed Victim, and the shotgun wadding recovered from the scene was from a 10-gauge shotgun, not a 12-gauge shotgun. Movant

33

argues this testimony would have countered the state's evidence he used a Browning .243 rifle and a 12-gauge shotgun to shoot Victim.

"Ordinarily the choice of witnesses is a matter of trial strategy and will support no claim of ineffective assistance of counsel." *Barton*, 432 S.W.3d at 750 (quoting *State v. Harris*, 870 S.W.2d 798, 816 (Mo. banc 1994)). "This is because 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Id.* at 750-51.

> To prove ineffective assistance for failure to call a witness, the defendant must show that: '(1) trial counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense.'

*Glass*, 227 S.W.3d at 468 (quoting *Hutchison v. State*, 150 S.W.3d 292, 304 (Mo. banc 2004)).[8]

Trial counsel's selection of which expert witnesses to call at trial generally is a question of trial strategy and is virtually unchallengeable. *Goodwin v. State*, 191 S.W.3d 20, 29 (Mo. banc 2006). To show ineffective assistance of counsel based on failure to present an expert witness, a movant is required to show what the evidence would have been if the witness had been called. *Twenter*, 818 S.W.2d at 636. However, the "duty to investigate does not force defense lawyers to scour the globe on the off-chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to

---

[8] *Hutchison* was overruled on other grounds by *Mallow v. State*, 439 S.W.3d 764, 770 n.3 (Mo. banc 2014).

34

think further investigation would be a waste." *Strong*, 263 S.W.3d at 652 (quoting *Rompilla v. Beard*, 545 U.S. 374, 383, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005)).

Howard testified at the evidentiary hearing he was contacted by the first trial team to conduct a case evaluation, determine which firearm fired the bullet that killed Victim based on general rifling characteristics, and determine whether the bullet could have been fired from a Browning lever action rifle. Howard's expertise was not in firearm and toolmark identification. Howard did not examine the evidence or bullets from this case independently. Instead, Howard's opinions were formed after reviewing the work of Jason Crafton (hereinafter, "Crafton"), a Missouri highway patrol ballistics expert who testified for the state at Movant's trial. Howard did not testify whether he examined the work of the other ballistics expert, John Dillon (hereinafter, "Dillon"), who testified for the state and disagreed with Crafton's trial conclusions. Howard offered no testimony regarding the shotgun wadding at the evidentiary hearing.

At trial, Crafton testified the bullets recovered from Victim and Movant's home were fired from the same gun, finding they shared the same class characteristics. Crafton could not pinpoint a specific caliber but opined it was a range of .22 to .24 caliber. Crafton further found the shotgun wadding components were consistent with a 10- to 12-gauge shotgun. Crafton excluded all of the firearms recovered from Movant's home as the murder weapon.

Marshall testified Howard told the first trial team the shotgun wadding was "almost certainly a 10-gauge," which was helpful to the defense because there was no evidence Movant ever owned a 10-gauge shotgun. Marshall stated Howard told him a

35

Browning .243 rifle could not have fired the bullet recovered from Victim's body. The first trial team turned over its entire file to trial counsel, including Howard's information.

Bruns testified he and Kessler discussed whether to call their own ballistics expert, but after looking at the state's experts, they decided against it. Kessler testified he was responsible for preparing the ballistics evidence for trial. Kessler admitted he did not contact Howard and never considered calling another ballistics expert to testify. Kessler explained, because he had two expert witnesses testifying for the state who disagreed with one another, he planned to emphasis those differences during cross-examination. Kessler noted even if Howard told him the toolmarks from the Browning .243 rifle were different from the toolmarks on the recovered bullets, he would not have considered calling Howard to testify. Kessler stated he had bad experiences in the past with cross-examination of his own ballistic witnesses. Kessler stated he would rather cross-examine two experts on the same side and get them to contradict each other than have his own "hired gun." The trial transcript reflects Kessler implemented this strategy of pointing out the contradictions between Crafton and Dillon during his cross-examination of both witnesses and throughout the trial.

The motion court found trial counsel's testimony that they reviewed the first trial team's entire file was credible. The motion court discounted the weight of Howard's testimony concerning his certifications and found he was not as experienced or knowledgeable as the state's ballistics experts. The motion court also rejected Howard's testimony excluding the Browning .243 rifle in lieu of Crafton's trial testimony that no exact firearm can be excluded unless the individual firearm is tested specifically.

36

"This Court will not challenge the motion court's determination of [an expert witness's] credibility as it could make the best observation [of the witness] or trial counsel's strategic decision not to call a witness." *Forrest,* 290 S.W.3d at 715 (internal citation omitted). Moreover, these findings refute the heart of Movant's argument trial counsel's strategy did not address the state's theory a Browning .243 rifle was used to kill Victim. Finally, Howard's alleged testimony about the shotgun wadding was cumulative to Crafton's trial testimony the wadding recovered was consistent with a 10- to 12-gauge shotgun.

"Counsel may choose to call or not call almost any type of witness or to introduce or not introduce any kind of evidence for strategic considerations." *Vaca v. State,* 314 S.W.3d 331, 337 (Mo. banc 2010). The motion court determined trial counsel presented a sound trial strategy for failing to call Howard on Movant's behalf. Kessler provided strategic reasons for choosing to forego presenting his own ballistics expert and instead chose to exploit the inconsistencies between Crafton's and Dillon's testimony. The motion court did not clearly err in denying this claim.

### Point VI – Failure to Refute Inheritance of a Browning .243 Rifle

Movant argues the motion court clearly erred in denying his claim trial counsel were ineffective for failing to call his grandfather, Gerald Sanders (hereinafter, "Sanders"), to testify Movant did not inherit a Browning .243 rifle from his father. Movant argues Sanders' testimony would have refuted the state's theory Movant disposed of this specific rifle only after shooting Victim.

To prevail on a claim trial counsel failed to call a witness to testify, the movant must demonstrate the witness' testimony would have provided a viable defense.

37

*Glass*, 227 S.W.3d at 468. Sanders was not called during the guilt phase and offered no testimony regarding any Browning .243 rifle Movant allegedly inherited from his father. However, the state called other witnesses who knew Movant and testified he inherited a rifle from his father.

Sanders testified at the evidentiary hearing he did not see Movant bring a Browning .243 rifle with him when Movant came to live with Sanders after Movant's father died. Sanders did not know what rifles Movant had at the time of the murder. Bruns testified he prepared and presented mitigating evidence during the penalty phase. Bruns stated it was "tenuous" whether they would have asked Sanders about Movant inheriting a Browning .243 rifle during his mitigation testimony. Kessler testified he spent a lot of time with Sanders leading up to the trial, and the information about inheriting the rifle would not have come in during mitigation because it would have challenged the jury's verdict.

Movant correctly notes trial counsel did not testify specifically about their strategic reasons for failing to call Sanders during the guilt phase to rebut the state's witnesses who testified Movant inherited a Browning .243 rifle. However, Kessler testified if Movant would have taken the stand during the guilt phase, Movant was prepared to admit ownership of a .243 caliber rifle. In anticipation of Movant testifying, Henshaw stated during her opening statement Movant "will acknowledge that at one time he owned a lever-action .243 [rifle]." Hence, trial counsel employed a trial strategy allowing for the possibility of Movant testifying on his own behalf and offering a viable defense. By not calling Sanders, trial counsel were pursuing a defense strategy that would not undermine

38

Movant's credibility if he chose to testify, which was reasonable. The motion court did not clearly err in denying this claim.

### Point VII – Failure to Object to Use of a Demonstrative Exhibit

Movant argues the motion court clearly erred in denying his claim trial counsel were ineffective for failing to object to the prosecutor displaying a Browning .243 rifle as a demonstrative exhibit during the trial because it was not the gun used in the shooting. Movant claims he suffered prejudice by its admission because the prosecutor used the unrelated rifle while questioning witnesses and during closing argument.

"The mere failure to make objections does not constitute ineffective assistance of counsel." *Dorsey*, 448 S.W.3d at 289 (quoting *Ervin v. State*, 80 S.W.3d 817, 822 (Mo. banc 2002)). "To obtain postconviction relief based on a failure to object, it 'must have been of such character as to deprive the defendant substantially of his right to a fair trial.'" *Id*.

"Demonstrative evidence, including a weapon, is admissible if the evidence is both legally and logically relevant." *State v. Brown*, 337 S.W.3d 12, 15 (Mo. banc 2011). Logical relevance refers to the tendency "to make the existence of a material fact more or less probable." *State v. Anderson*, 306 S.W.3d 529, 538 (Mo. banc 2010). Legal relevance refers to the assessment of probative value relative to the risk of "unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Id*. "Therefore, when assessing the relevance of demonstrative evidence, a court must ensure the evidence is a fair representation of what is being demonstrated and that it is not inflammatory, deceptive or misleading." *Brown*, 337 S.W.3d at 15.

39

The first trial team filed a motion in limine to exclude the prosecutor's use of a Browning .243 rifle as a demonstrative exhibit during the trial. The motion alleged the demonstrative exhibit had no probative value and would be highly prejudicial because no murder weapon was recovered. The motion was not called up and was deemed overruled prior to trial. Kessler testified he had no reason for failing to call up the motion.

The motion court correctly found there was no basis in the evidence to support a finding the circuit court would have sustained an objection to using the Browning .243 rifle as a demonstrative exhibit. Witnesses testified Movant had inherited a Browning .243 rifle from his father. This rifle was never recovered from any of the searches of Movant's home or property, which comported with the state's theory that Movant disposed of the rifle after shooting Victim. Both ballistics experts testified the bullet recovered from Victim belonged to the .22 to .24 caliber class of ammunition, which included a Browning .243 caliber rifle. Finally, Kessler testified, if Movant would have taken the stand, Movant was prepared to admit ownership of a .243 caliber rifle, and this fact was mentioned in the defense's opening statement. Hence, any objection to the use of the demonstrative exhibit would not have been meritorious. Trial counsel will not be held ineffective for failing to make a nonmeritorious objection. *Tisius v. State*, 519 S.W.3d 413, 429 (Mo. banc 2017). The motion court did not clearly err in denying this claim.

### Points VIII and IX – Failure to Call Guilt Phase Witnesses

Movant argues the motion court clearly erred in denying his claim trial counsel were ineffective for failing to call four witnesses who told police they saw Movant driving his pickup truck during the time he was alleged to be driving the red car observed waiting near

40

Victim's home and fleeing Victim's home after he was shot. Movant argues these witnesses would have corroborated his defense he did not shoot Victim.

To prove ineffective assistance of counsel for failure to call certain witnesses at trial, Movant must establish the witnesses' testimony would have produced a viable defense. *Collings*, 543 S.W.3d at 18. "When defense counsel believes a witness' testimony would not unequivocally support his [or her] client's position, it is a matter of trial strategy not to call him [or her], and the failure to call such witness does not constitute ineffective assistance of counsel." *Winfield v. State*, 93 S.W.3d 732, 739 (Mo. banc 2002).

*Sylvan and Carol Duncan*

Sylvan and his wife, Carol (hereinafter and, collectively, "the Duncans"), were questioned by police, deposed by the first trial team, and subpoenaed for trial. The Duncans lived on the same road as Movant and his grandmother. Carol and Movant's grandmother had been friends for many years. On the day of the murder, Movant was supposed to help Sylvan move some brush off of his property, but Movant did not show up. Sylvan saw Movant's truck at Movant's home when he went to move the brush but saw Movant's truck leave between 2 and 3 p.m. Carol told police Movant's grandmother's red car was gone from her house around 12:45 p.m. or 1 p.m. Carol stated she could see Movant's grandmother's driveway from her kitchen window and she saw the red car in the driveway "no more than three hours later."

At 4:30 p.m., the Duncans went for a walk for approximately thirty minutes. Movant was in his truck driving when the Duncans stopped and spoke to him. Carol stated they spoke to Movant at approximately 4:45 p.m. and Sylvan stated it was 5:15 p.m.

41

Movant told Sylvan he was in his home taking a nap when he was supposed to help Sylvan move the brush.

The next day, Movant spoke to the Duncans about Victim's murder. Movant told the Duncans Victim had been shot in the face and "I heard that you could just take the flap -- his face and just pull it back and then lay it back over." Carol told Movant someone would have had to have been "awfully close to do something like that," to which Movant replied, "Not if you were using turkey loads."

During opening statements, Henshaw told the jury the Duncans would testify. Henshaw stated the Duncans would testify that, at the same time the state alleged Movant was in his grandmother's red car parked near Victim's home, they observed the red car through their kitchen window because it had been returned. Henshaw stated the Duncans stopped and spoke to Movant later that afternoon, as Movant was driving home in his pickup truck at the same time the state alleged Movant was fleeing the scene. However, when the defense rested, Kessler stated on the record they were not calling the Duncans to testify.

The Duncans testified at the evidentiary hearing, largely repeating their deposition testimony. Carol testified Movant's grandmother told her Movant borrowed her red car that afternoon. Carol conceded she did not see the red car leave or return and did not know who was driving it. Carol repeated how Movant described Victim's face after being shot.

Bruns and Henshaw testified they knew the Duncans' statements concerned the red car evidence, but neither articulated a reason why they failed to call the Duncans to testify

at trial. Bruns explained, if the Duncans testified about Movant's description of Victim's face, they would not be good witnesses unless they were going to show actual innocence.

Kessler testified Movant had input about whether to call the Duncans as witnesses. Kessler testified they discussed the pros and the cons of having the Duncans testify. Kessler and Henshaw visited the Duncans at their home to speak with them. Kessler explained trial counsel concluded the Duncans offered Movant an imperfect alibi after speaking to them, reviewing the police reports, and reviewing their depositions. Because there was a hole in the timeline, Kessler did not want to put on any witness who offered an imperfect alibi. Kessler described Carol's account as "unsure or she couldn't be as sure" about the timeline, and he did not believe Sylvan would hold up under cross-examination. The motion court found trial counsel were not ineffective for failing to call the Duncans because their testimony would have harmed Movant and benefitted the state.

Trial counsel conducted a thorough investigation regarding the Duncans' testimony, including reviewing all of their pretrial statements and meeting with them in person. Trial counsel determined the Duncans could, at best, provide an imperfect alibi, which Kessler explained trial counsel were not comfortable presenting. Further, having the Duncans testify about Movant's graphic description of Victim's face after being shot would benefit the state to Movant's detriment. Trial counsel were not ineffective for failing to call the Duncans to testify at trial.

*James Chandler*

James Chandler (hereinafter, "Chandler") was deposed prior to trial by the first trial team but was not called as a witness at trial. Chandler testified at the evidentiary hearing

43

he saw Movant driving his truck near Chandler's home at 2:30 p.m. on the afternoon of the murder. Kessler testified Movant had input on whether to call Chandler as a witness. Kessler explained Chandler's testimony would only highlight for the jury there was a timeframe in which something could have happened, as opposed to arguing Movant was not there at all, undermining their defense theory.

The motion court found Chandler's testimony would not have provided Movant a viable alibi defense. This Court agrees. Even if the jury believed Chandler's testimony, it would not provide Movant with an alibi because Chandler's testimony does not account for Movant's whereabouts at the time Victim was shot. *See Winfield*, 93 S.W.3d at 739. Trial counsel were not ineffective for failing to call Chandler to testify at trial.

*Mila Linn*

In claim 8(c) of his Rule 29.15 motion, Movant argued trial counsel were ineffective for failing to call Mila Linn (hereinafter, "Linn") and her son to testify during the guilt phase that they saw a 1990s two-door red car in the area of Victim's home at the time of the murder. Linn gave statements to police and was deposed prior to trial. Linn stated she lived approximately a half-mile north of Victim's home. On the day of the murder, Linn stated she saw an older red car with a loud muffler driving near the dumpster situated near Victim's home. Linn described the driver as a stranger with shaggy brown hair, a sunken face, and clean-shaven. Linn was later shown a photo array that included Movant but she did not identify Movant as the driver. Linn admitted Victim detained her for a driving while intoxicated charge a day or two before he was murdered. Linn also conceded she

could not remember much from this time because she was a heavy drinker.  The first trial team provided these materials to trial counsel.

Although Linn was not called as a witness at trial, a police officer testified he showed Linn a photo array and she did not identify Movant as the driver of the red car she observed near Victim's home.  During closing argument, Kessler argued the state was hiding the ball because it did not present Linn's testimony about observing the same red car as the other witnesses, but not identifying Movant as the driver.  Bruns testified trial counsel considered calling all potential witnesses, including Linn, but he could not remember why she was not called.  Bruns acknowledged avoiding impeachment would be a reason not to call a particular witness.  Bruns noted Kessler was free to use Linn's statements during closing argument.

The motion court found Movant failed to present any evidence to support his claim regarding Linn's testimony, hence the claim was deemed abandoned.  At the outset of the evidentiary hearing, Movant formally waived claim 8(c) only with respect to presenting testimony from Linn's son, not Linn herself.  Movant intended to depose Linn for the evidentiary hearing, but no post-conviction deposition was filed.  However, Linn's pretrial deposition was offered as an exhibit and was before the motion court.

Even if this Court found the motion court erred in finding this claim abandoned, Movant would not be entitled to relief because he was not prejudiced by this error.  When examining Linn's pretrial deposition, it is clear her testimony would be undermined severely due to her admission her memory of the events was impaired by heavy drinking. Linn would be subjected to impeachment, which Bruns testified would be a reason not to

call her to testify. Further, trial counsel were able to use the most helpful portion of Linn's statement when questioning the police officer and during closing argument, while avoiding Linn's impeachment. Trial counsel were not ineffective for failing to call Linn to testify at trial. The motion court did not clearly err in denying these claims.

**Point X – Failure to Impeach Guilt Phase Witness**

Movant alleges the motion court clearly erred in denying his claim trial counsel were ineffective for failing to impeach Lisa Hart's (hereinafter, "Hart") trial testimony that she did not know where the yellow sticker was located on the red car she saw near Victim's home on the day of the murder. Movant claims Hart's deposition and written statements indicate she saw the yellow sticker from the front of the car when the sticker was located on the back of the vehicle. Movant argues this impeachment was critical because the state's theory was Movant borrowed his grandmother's red car and Hart identified the car as the one she saw near Victim's home.

"Ordinarily, the failure to call a witness will not support an ineffective assistance of counsel claim because the choice of witnesses is presumptively a matter of trial strategy." *Tisius*, 519 S.W.3d at 427. This presumption applies to trial counsel's decision not to impeach a witness. *McFadden v. State*, 553 S.W.3d 289, 305 (Mo. banc 2018). Movant "has the burden of showing that the impeachment would have provided [him] with a defense or would have changed the outcome at trial." *Id*. (quoting *State v. Phillips*, 940 S.W.2d 512, 524 (Mo. banc 1997)).

At trial, Hart testified she and her husband drove to view a home to purchase near Victim's residence at approximately 1:45 p.m. on the day of the murder. Hart testified she

46

saw a red car and "[f]or some unknown reason there was a yellow fist to softball-sized sticker that stuck out." Hart stated the red car was still on the street when she and her husband left between 3 and 3:30 p.m. Hart later contacted the police after hearing about Victim's murder and went to the command center to speak to an investigator. When she arrived, she saw a red car with a yellow sticker on it and told her husband, "That's it." Hart stated she was "100 percent sure" it was the "exact same car" she saw parked near Victim's residence. Hart's pretrial deposition testimony and written statements indicated she saw the yellow sticker on the red car's front end, when the yellow sticker was located on the back end of the car.

Henshaw testified at the evidentiary hearing she was responsible for the red car evidence. Henshaw had no recollection of Hart's testimony or a reason why she did not impeach her testimony. Henshaw could not articulate a strategic reason for failing to impeach Hart's testimony, but she explained part of the strategy during opening statement was to concede Movant drove his grandmother's red car that day. Although trial counsel did not attempt to impeach Hart's testimony with her previous statements, they attempted to bring out discrepancies in her testimony by calling her husband. Kessler indicated "it did not go well." Hence, trial counsel made an attempt—albeit an unsuccessful one—to impeach Hart's testimony.

"Reasonable choices of trial strategy, no matter how ill-fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance." *Anderson*, 196 S.W.3d at 33. Even if this Court found trial counsel's unsuccessful attempt ineffective, Movant suffered no prejudice in light of the other witnesses who testified about the red car.

47

Moreover, impeachment would not undermine Hart's trial testimony she was "100 percent sure" the red car she saw at the command center was the same red car she saw parked near Victim's home, regardless of where the yellow sticker was placed. Movant has not demonstrated the outcome of the trial would have been different had trial counsel impeached Hart's testimony regarding the yellow sticker's location. The motion court did not clearly err in denying this claim.

**Point XIII – Failure to Object to Comment on Movant's Right to Testify**

Movant argues the motion court clearly erred in denying his claim trial counsel were ineffective for failing to object, request a curative instruction, and request a mistrial when the prosecutor commented, "someone does" in response to Hart's testimony she did not know why Movant's grandmother's red car was parked near Victim's home. Movant argues the prosecutor's comment was a reference to his right to remain silent and implicated Movant knew why the red car was parked at Victim's home.

During Hart's trial testimony, the prosecutor asked her, "Do you know why [Movant's grandmother's] car would be across from where [Victim] was murdered --?" to which Hart responded, "No." The prosecutor then commented, "Someone does." The circuit court stated, "Keep the comments to yourself. I've already warned defense counsel." Trial counsel did not object to the comment, did not ask the jury to be instructed to disregard it, or request a mistrial. The circuit court later instructed the jury Movant had the right not to testify and the jury could draw no adverse inference from his failure to do so.

48

Movant raised this claim in his direct appeal, arguing the circuit court committed plain error in not sua sponte granting Movant a mistrial because the words "someone does" constituted a direct comment about his failure to testify. This Court rejected Movant's claim, finding the comment was not a direct comment nor did it need to determine whether it was an indirect comment because Movant had "fallen far short" of showing his comment had a decisive effect on the jury. *Shockley*, 410 S.W.3d at 189-190. Henshaw did not recall the prosecutor's statement or a reason why she failed to object or seek other relief.

The motion court echoed this Court's finding the statement was not a direct comment about Movant's failure to testify, nor did Movant demonstrate the comment had a decisive effect on the jury. This Court agrees. Any objection to the comment would have drawn additional, unwanted attention to the statement; hence, it was reasonable for trial counsel to refrain from objecting. *Barton*, 432 S.W.3d at 754. Moreover, to obtain post-conviction relief based on a failure to object, it "must have been of such character as to deprive the defendant substantially of his right to a fair trial." *Dorsey*, 448 S.W.3d at 289 (quoting *Ervin*, 80 S.W.3d at 822). Trial counsel's attempt to obtain curative relief would not have been meritorious nor can Movant demonstrate had trial counsel objected, this Court would have ordered a new trial if this claim was presented as one for preserved error. Finally, Movant cannot demonstrate he suffered prejudice from trial counsel's failure to object to this single comment when examining the entire trial. The motion court did not clearly err in denying this claim.

## Point XII – Failure to Object to State's Penalty Phase Exhibits

Movant claims the motion court clearly erred in denying his claim trial counsel were ineffective for failing to object to victim impact evidence exhibits admitted during the penalty phase, which included a funeral casket photograph, a video montage shown at Victim's funeral, and a drawing by Victim's son depicting what his son described as Movant shooting Victim. Movant argues these victim impact exhibits individually and collectively were so inflammatory they injected passion, prejudice, and arbitrariness into the penalty phase. Movant did not challenge the admission of the exhibits on direct appeal.

"Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." *State v. Storey*, 40 S.W.3d 898, 908 (Mo. banc 2001) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991)). "As a general rule, the trial court has discretion during the punishment phase of trial to admit whatever evidence it deems helpful to the jury in assessing punishment." *State v. Winfield*, 5 S.W.3d 505, 515 (Mo. banc 1999) (quoting *State v. Kinder*, 942 S.W.2d 313, 331 (Mo. banc 1996)).

Bruns testified the state had a right to present victim impact evidence and he does not object unless it goes "overboard." Bruns explained he generally tries not to object during the state's presentation of aggravating circumstance evidence because he hopes the state will not object during the defense's presentation of mitigating circumstance evidence. Bruns acknowledged the law concerning what is admissible is broad and very discretionary. Bruns admitted he did not object to each of the complained of exhibits.

50

Regarding the funeral casket photograph, Bruns stated, "Out of everything that's coming in I can't imagine that that sort of photograph is the worst thing …." Regarding the video montage, Bruns explained, "My judgment at the time must have been they could do worse stuff to us quite frankly." Finally, regarding Victim's son's drawing, Bruns conceded the drawing was "terrible and terribly hurtful," but it is "probably going to come in."

Movant argues this Court should apply the holding in *State v. Hess*, 23 A.3d 373 (N.J. 2011), to find Bruns was ineffective for failing to object to showing the video montage from Victim's funeral. In *Hess*, the New Jersey Supreme Court vacated a guilty plea, in part, due to trial counsel's ineffectiveness for failing to object at sentencing to a seventeen-minute victim impact video from the police officer victim's funeral. *Id*. at 394. The video was scored to popular and religious music, professionally produced, included a television news segment about the victim's funeral, had three poems scrolling over photographs, and ended with a photograph of the victim's headstone. *Id*. at 381. The New Jersey Supreme Court explained:

> Undoubtedly, concerns over prejudicial victim-impact statements, including photographs and videos, are less pronounced when a judge rather than a jury is imposing sentence. Nevertheless, judges, no less than jurors, are susceptible to the wide range of human emotions that may be affected by irrelevant and unduly prejudicial materials. We are fully aware that judges, who are the gatekeepers of what is admissible at sentencing, will have viewed materials that they may deem non-probative or unduly prejudicial. We have faith that our judges have the ability to put aside that which is ruled inadmissible. However, both the bar and bench should know the general contours of what falls within the realm of an appropriate video of a victim's life for sentencing purposes.

*Id*. at 392 (internal citation omitted). After examining several cases from other jurisdictions, the New Jersey Supreme Court held, "An overly lengthy video, baby

51

photographs of an adult victim, and a video scored to religious and pop music do not advance any legitimate objective …." *Id*. at 394. The court also noted the photograph of the victim's headstone and the television segment about the victim's life did "not project anything meaningful about the victim's life as it related to his family or others at the time of his death." *Id*.

In this case, the video montage presented to the jury was compiled by Victim's family, was four minutes in length, set to music, and contained photographs from Victim's childhood through adulthood. While there are some similarities to the video in *Hess*, Victim's video was significantly shorter, not produced professionally, and did not contain photographs of Victim's headstone, poems, a variety of music, or television news coverage. Hence, this Court declines Movant's invitation to find *Hess* dispositive, especially given the New Jersey's Supreme Court's recognition it could not "set forth an exhaustive catalogue of what is and is not permissible in a video, other than to say how *this video* exceeded permissible bounds." *Id*. (emphasis added).

Bruns gave strategic reasons for not objecting to the victim impact evidence presented during the penalty phase. Kessler testified in his experience it was not uncommon to play a funeral video during the penalty phase, and he did not think it was objectionable. Kessler explained objecting would make it appear as if Movant were trying to hide someone's grief, which would not be in anyone's best interest. Moreover, Movant cannot demonstrate the outcome of the trial would have been different had Bruns objected because any objection to the admissible exhibits would have been nonmeritorious. The motion court did not clearly err in denying this claim.

52

**Point XVI – Failure to Call Mitigation Witnesses**

Movant argues the motion court clearly erred in denying his claim trial counsel were ineffective for failing to call three mitigation witnesses to highlight Movant was a good father, was a hard worker, and had been impacted by his father's death. Movant believes he would have received a life sentence if these witnesses had testified during the penalty phase.

Prevailing professional standards for capital defense work require trial counsel to "discover *all reasonably available* mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S. Ct. 2527, 2537, 156 L. Ed. 2d 471 (2003); *Johnson v. State*, 388 S.W.3d 159, 165 (Mo. banc 2012). This evidence includes "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Id*. Ordinarily, the failure to call a witness will not support an ineffective assistance of counsel claim because the choice of witnesses is presumptively a matter of trial strategy. *Davis v. State*, 486 S.W.3d 898, 909 (Mo. banc 2016). Further, trial counsel will not be deemed ineffective for failing to present cumulative evidence. *Deck v. State*, 381 S.W.3d 339, 351 (Mo. banc 2012).

Bruns presented three mitigation witnesses during the penalty phase. Laura Smith (hereinafter, "Smith"), the mother of Movant's children, testified about the importance of Movant having a relationship with his children, even if he were incarcerated. Movant's cousin testified about his character, their relationship, and Movant's care of his grandparents. Sanders testified extensively about Movant's life, how Movant came to live

with Sanders after his father died, the help he provided Sanders in caring for him and his business, and how he loved Movant like one of his own children.

Bruns described Sanders as a great witness who was well-liked in the community. Further, Bruns specifically testified, when presenting mitigating evidence, he generally tried to get the "best witnesses" to tell "really good stories" to establish for the jury the person's life was meaningful. Bruns stated they discussed mitigation witnesses with Movant, who had ideas and opinions about the witnesses and the evidence. Kessler testified they did not call any additional witnesses after Sanders' testimony because he was tearful on the stand and elicited an emotional response from the jurors. Despite these witnesses, Movant believes additional testimony would have persuaded the jury to give him a life sentence.

*Velma Dowdy*

Velma Dowdy (hereinafter, "Dowdy") testified at the evidentiary hearing she had known Movant his entire life. Dowdy was Movant's neighbor and Smith was her granddaughter. Dowdy testified Movant was a good father, and she saw him at family events. Marshall testified he did not remember Dowdy, but a casefile memorandum stated Movant indicated Dowdy was "crazy." Bruns testified he had no contact with Dowdy.

The motion court found trial counsel were not ineffective for failing to call Dowdy to testify because Movant characterized her as "crazy" and, therefore, unreliable. Moreover, Dowdy's testimony would have been cumulative to other witnesses' testimony regarding Movant's family life. Trial counsel were not ineffective for failing to call Dowdy to testify.

54

*Eugene Jackson*

Eugene Jackson (hereinafter, "Jackson") testified at the evidentiary hearing he had been friends with Movant since childhood. Jackson never saw Movant have problems with other people or get into physical fights with anyone. Jackson testified Movant took in the daughter of a friend who was having issues. Bruns testified he had no contact with Jackson. The record is unclear whether Movant or anyone else informed trial counsel Jackson was a potential witness. To find trial counsel ineffective for failing to call a witness, Movant bears the burden of proving "trial counsel knew or should have known of the existence of the witness." *Glass*, 227 S.W.3d at 468 (quoting *Hutchison*, 150 S.W.3d at 304). Hence, trial counsel were not ineffective for failing to call Jackson to testify.

*Clarence "Butch" Chilton*

Clarence "Butch" Chilton (hereinafter, "Chilton") testified at the evidentiary hearing he was Movant's little league coach and Smith's uncle. Chilton was good friends with Movant's father before he died. Chilton testified Movant took his father's death hard. The motion court correctly found Chilton's testimony cumulative to that of other witnesses who were familiar with Movant's family. Further, Chilton did not offer any recent and specific stories about his interaction with Movant. Trial counsel were not ineffective for failing to call Chilton to testify. The motion court did not clearly err in denying this claim.

**Point XIV – Failure to Object to Police Presence during Trial and Sentencing and
Failure to Object to Elected Circuit Judge Sentencing[9]**

Movant alleges the motion court clearly erred in denying his claim trial counsel were ineffective for failing to object to the visible police presence in and around the courthouse during the trial and sentencing because it sent a message to convict Movant based on Victim's police affiliation and because Movant was an extremely dangerous person. Movant must demonstrate trial counsel's failure to object resulted in a substantial deprivation of his right to a fair trial. *Dorsey*, 448 S.W.3d at 289.

*Police Presence during the Trial and Sentencing*

Movant's aunt testified at the evidentiary hearing there were approximately fifty to sixty armed, uniformed officers outside the courthouse during voir dire in Carter County. When Movant's trial was conducted in Howell County, Movant's aunt observed armed officers in the courthouse square, on top of buildings, and at every door. Movant's aunt estimated there were seventy-five to one hundred police officers present each day. Movant's aunt testified there were many people lined up in the square yelling things at Movant as he was escorted in and out of the courthouse.

---

[9] This point raises two distinct claims of error in violation of Rule 84.04(d). Rule 84.04 is not merely an exhortation from a judicial catechism nor is it a suggestion of legal etiquette. *Thummel v. King*, 570 S.W.2d 679, 686 (Mo. banc 1978). Appellate counsel should be mindful of the dictates of Rule 84.04 to avoid claims being dismissed for failure to comply. However, it is this Court's policy to decide a death penalty case on its merits rather than on technical deficiencies in the brief. *Christeson v. State*, 131 S.W.3d 796, 799 n.5 (Mo. banc 2004).

Kessler testified the circuit court excluded or prevented law enforcement officers from watching or participating in the trial while dressed in their uniforms. As far as a large police presence outside the courtroom, Kessler had no specific recollection of anything other than seeing a newspaper article with a photograph of Movant in a bulletproof vest surrounded by people outside the courthouse. Because the jury was sequestered, Kessler explained they did not come through "a phalanx of uniformed people" to get in and out of the courthouse. Kessler saw rifles while Movant was transported, but he did not believe the jury saw this so he did not bring it to the circuit court's attention. There was never a time Kessler saw anyone with a gun around Movant while in the jury's presence.

Bruns and Henshaw testified there was a large police presence in Howell County when Movant was transported to trial. Bruns testified "there were threats to everybody," including lay people yelling and protesting about Movant's trial. Bruns stated there was a genuine concern someone would shoot Movant as he was transported. Henshaw testified the large police presence was to protect Movant from different threats made against him, and he was transported in a bulletproof vest. Several jurors testified at the evidentiary hearing, and none of them testified they observed a large police presence during the trial or it influenced their opinion of Movant or their verdict.

Kessler estimated approximately thirty uniformed highway patrol officers attended Movant's sentencing. Kessler did not object because the circuit court knew they were officers regardless of how they were dressed. Bruns testified the courtroom was full during Movant's sentencing, but he did not object to the police presence because he did not believe their presence would affect the circuit court.

57

The motion court found the need for security in the courthouse and at the trial was important for the circuit court to consider. Hence, the circuit court was in the best position to determine whether the police presence at the trial was distracting or had a prejudicial effect. Further, there was no evidence any of the jurors came into contact with law enforcement officers inside or outside the courthouse during the trial.

In *Johnson*, this Court rejected a similar claim when the evidence demonstrated the jurors were sequestered throughout the proceedings, they had no contact with any of the spectators at any point during the trial, and no officer present caused any disturbance to the proceedings. *Johnson*, 406 S.W.3d at 903. Further, the circuit court retains wide discretion in determining whether to take action to avoid an environment for trial in which there is not a "sense or appearance of neutrality." *State v. Baumruk*, 85 S.W.3d 644, 649-50 (Mo. banc 2002). Here, trial counsel testified they did not believe the large police presence impacted the jury's decision. Further, none of the jurors testified about observing a large police presence. Trial counsel were not ineffective for failing to object to the large police presence at Movant's trial and at sentencing.

*Elected Trial Judge Sentencing*

Movant further alleges trial counsel were ineffective for failing to object to the elected circuit judge imposing sentencing in the face of a large police presence. Movant argues reasonable counsel would have objected to an elected circuit judge imposing a sentence due to "electoral pressures to impose death as evidenced by the police presence at sentencing." Movant argues he was prejudiced because he otherwise would not have received a death sentence.

58

The motion court held this claim was not cognizable in a Rule 29.15 action because it should have been raised on direct appeal in that it challenged the constitutional validity of the death penalty. Assuming arguendo the claim was cognizable, the motion court found Movant did not demonstrate prejudice.

This Court finds Movant failed to present any evidence regarding this claim at the evidentiary hearing. "Allegations in a postconviction motion are not self-proving; rather, a movant bears the burden to prove his claim of ineffective assistance by a preponderance of the evidence." *Gittemeier v. State*, 527 S.W.3d 64, 71 (Mo. banc 2017). "Failure to present evidence at a hearing in support of factual claims in a post-conviction motion constitutes abandonment of that claim." *Id.* (quoting *State v. Nunley*, 980 S.W.2d 290, 293 (Mo. banc 1998)). Trial counsel were not asked about their failure to object or offer any reason why an elected circuit court judge could not impose sentencing. Alternatively, even if trial counsel's testimony could be construed to include such a claim, Movant offers nothing more than conclusory arguments regarding the outcome of the case. The motion court did not clearly err in denying these claims.

### Point XV – Ineffective Assistance of Appellate Counsel

Movant claims the motion court clearly erred in denying his claim appellate counsel was ineffective for combining arguments regarding character and propensity grounds concerning an officer's testimony the police brought a S.W.A.T. team to apprehend him because of his violent history. Movant argues competent appellate counsel would not have combined these claims, causing the claim to be reviewed for plain error only.

59

"To prevail on a claim of ineffective assistance of appellate counsel, the movant must establish that counsel failed to raise a claim of error that was so obvious that a competent and effective lawyer would have recognized and asserted it." *Williams v. State*, 168 S.W.3d 433, 444 (Mo. banc 2005). Additionally, the movant must prove, "if counsel had raised the claims, there is a reasonable probability the outcome of the appeal would have been different." *Taylor v. State*, 262 S.W.3d 231, 253 (Mo. banc 2008).

During the trial, an officer testified a S.W.A.T. team accompanied him to interview Movant on the night of Victim's murder "due to [Movant's] violent history." Kessler objected, stating, "I object to any introduction of his history. This goes to character …." The state countered the testimony would not go into Movant's violent history but would be used to explain the officer's actions and address Movant's argument the police unfairly targeted him as a suspect. The circuit court sustained the objection. Kessler then asked the jury to be instructed to disregard the statement, and he requested a mistrial. The circuit court instructed the jury to disregard the comment "regarding any character or reputation of [Movant]" but overruled Kessler's motion for a mistrial.

On direct appeal, Movant argued the circuit court erred in failing to sustain his motion for a mistrial because the reference to Movant's violent history constituted impermissible propensity evidence. The state argued this issue was not preserved and the reference did not constitute propensity evidence. This Court engaged in a lengthy analysis of the objection raised, the arguments presented, and whether they were preserved, which will not be repeated here. *See Shockley*, 410 S.W.3d at 191-96. This Court found the argument on appeal attempted to merge the character and propensity evidence concepts,

which are distinct. *Id*. at 193. This Court concluded no plain error occurred because the comment was made to explain the police's actions after Movant opened the door to the issue and there was other evidence presented in which Movant threatened police officers. *Id*. at 194.

Michael Gross (hereinafter, "Gross") represented Movant on appeal. Gross testified he argued the comment was to impugn Movant's character and to make the jurors more prone to find him guilty of the offense charged in this case because of a propensity to engage in violent criminal behavior. Gross did not believe the issues were separate and based his argument on recent Court precedent that he interpreted to mean propensity evidence had evolved to fit into a character argument. Gross admitted he would have argued the issue differently if he knew the Court would consider them separate issues.

The motion court reviewed the trial transcript, trial counsel's objection, and this Court's analysis in rejecting this claim. The motion court did not find the comment so egregious that it required a mistrial. The motion court further found the curative instruction admonishing the jury to disregard the officer's statement, combined with substantive evidence of guilt, supported a finding the single comment did not play a decisive role in the verdict. This Court agrees. Although this Court did not find the specific propensity argument preserved, the Court engaged in an extensive analysis regarding the comment and its impact on the trial, ultimately denying Movant relief. *Id*. at 195-96. Movant has not offered any additional evidence that, had Gross raised the issue differently, this Court would have reversed his conviction. *Taylor*, 262 S.W.3d at 253. The motion court did not clearly err in denying this claim.

61

**Point XVII – Alleged *Brady* Violations**

Movant argues the motion court clearly erred in denying his claim regarding the state's alleged violation of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), for failing to disclose data Victim possessed relating to other possible suspects. Movant alleges an investigation regarding possible corruption of Carter County law enforcement would have produced evidence supporting someone other than Movant shot Victim.

If the state suppresses evidence favorable to a defendant and material to either the guilt or penalty phase, due process is violated. *Brady*, 373 U.S. at 87. The state violates due process regardless of whether it withheld the evidence in good faith or in bad faith. *Id.*; *Gill v. State*, 300 S.W.3d 225, 231 (Mo. banc 2009). A *Brady* violation contains three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [s]tate, either willfully or inadvertently; and prejudice must have ensued." *Johnson*, 406 S.W.3d at 901 (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *Taylor*, 262 S.W.3d at 240).

While gathering discovery for the evidentiary hearing, post-conviction counsel indicated there was reason to believe Victim maintained investigative files related to criminal wrongdoing by Carter County law enforcement personnel. Post-conviction counsel sought discovery of Victim's computer drives. While one drive was provided, the

62

parties later stipulated two of the hard drives were no longer accessible due to the passage of time and other factors.

At the evidentiary hearing, three witnesses testified Victim's former fiancée told them Victim was investigating possible corruption by Carter County law enforcement officials before he was murdered.[10] There was testimony adduced Victim kept these files at home on his personal computer. Victim's former fiancée testified and denied having told anyone Victim was conducting any investigation or that he kept the files at home on his personal computer. Victim's former fiancée stated she did not use or look at Victim's personal computer, and she did not see Victim perform any work on his home computer.

Because the parties stipulated the hard drives were no longer accessible, the motion court found there was no evidence the state withheld files on the hard drives. The motion court discounted the three witnesses' testimony about the home computer's contents as "vague and speculative at best." The motion court further found Movant could not demonstrate prejudice because he could not present evidence beyond speculation and conjecture about the hard drives' contents. This Court agrees. Movant cannot demonstrate the outcome of his trial would have been different if he had access to what is only vague and speculative information. The motion court did not clearly err in denying this claim.

---

[10] The motion court heard this evidence only to determine whether the state's failure to disclose this information violated *Brady*, not for the truth of the matter asserted.

**Conclusion**

The motion court did not clearly err in overruling Movant's Rule 29.15 motion for post-conviction relief after an evidentiary hearing. The motion court's judgment is affirmed.

_____
GEORGE W. DRAPER III, JUDGE

Fischer, C.J., Wilson, Russell, Powell, and Breckenridge, JJ., concur; Stith, J., dissents in part and in result in separate opinion filed.

64



# SUPREME COURT OF MISSOURI
## en banc

LANCE C. SHOCKLEY,           )
                                            )
          Appellant,          )
                                            )
v.                                     )      No. SC96633
                                            )
STATE OF MISSOURI,            )
                                            )
          Respondent.     )

## OPINION DISSENTING IN PART AND IN RESULT

I respectfully dissent from the portion of the principal opinion holding counsel were not ineffective in failing to question Juror 58 during voir dire about the provocative novel he admitted writing and in failing to call other jurors in support of Mr. Shockley's motion for new trial. On direct appeal, this Court held, because of these failures, the record did not support Mr. Shockley's claim that Juror 58 should have been stricken for cause or that the other jurors saw his book and it affected their deliberations. *State v. Shockley, 410 S.W.3d 179, 201 (Mo. banc 2013).* Because the postconviction hearing demonstrates counsel had no valid strategic reason for failing to voir dire Juror 58 and for choosing not to question other jurors about when and how they were exposed to his violent novel, I would find both failures constituted ineffective assistance that may have affected the

outcome of the trial.

In explaining why they did not question Juror 58 about his novel during voir dire, defense counsel stated at the postconviction hearing that they focused on Juror 58's statements his son was a police officer and he had a knowledge of guns and therefore, did not further question Juror 58 regarding his novel. Like the motion court, the principal opinion says this was not ineffective because this questioning was closely aligned with the counsel's trial strategy, which the principal opinion explains as using voir dire to uncover pro-law enforcement bias and knowledge about firearms. In support, the principal opinion cites *Clayton v. State*, *63 S.W.3d 201, 207-08 (Mo. banc 2001)*, for the proposition that "[i]t is not ineffective assistance of counsel for an attorney to pursue one reasonable trial strategy to the exclusion of another, even if the latter would also be a reasonable strategy."

*Clayton* does not support the principal opinion's reasoning. It holds merely that it was not unreasonable for counsel to put on evidence of both diminished capacity and reasonable doubt as to guilt, rather than focusing on just one defense. *Id. at 208*. In other words, in *Clayton* counsel had to choose whether it was better to pursue only one defense or whether it was wiser strategy to pursue two theoretically slightly inconsistent defenses at the same time. *Id. at 207*.

A similar strategic choice is not required when a potential juror reveals multiple sources of bias, however. Counsel could, and should, examine the potential juror about all of the revealed biases. It is not reasonable to pick only one disqualifying or biasing issue to examine further. Yet, that is what counsel admitted they did here. Because they wanted to follow up on Juror 58's son's employment as a police officer, they chose not to question

2

him about his novel.  This choice was unreasonable.

The principal opinion states that finding counsel's voir dire ineffective would be equivalent to adopting a rule that "a potential juror's employment as an author, standing alone, establishes the juror has 'multiple sources of bias.'"  The dispositive fact here is not that Juror 58 was an author.  What is relevant here is that Juror 58, on his own initiative, approached the bench during a break to inform the court he had not revealed as yet during voir dire that he was a published author and he thought "maybe I should be coming out with fact [sic] as well."  When a venireperson feels strongly enough that a piece of information may be relevant for consideration in voir dire that he himself suggests it to the court on his own initiative, defense counsel is ineffective in failing to investigate what made the venireperson believe the information needed to be disclosed .  For this reason, the principal opinion's attempt to distinguish *Knese v. State*, *85 S.W.3d 628, 632 (Mo. banc 2002)*, is unavailing. As in that case, the failure here to conduct a basic investigation of the juror's bias was ineffective.

This error was compounded by counsel's rejection of the circuit court's offer to allow counsel to call Juror 58 and other jurors during the hearing on the motion for new trial.  The failure to follow up during voir dire and by calling jurors in support of the motion for new trial meant the record before the circuit court and this Court on appeal did not support grant of a new trial, resulting in the conviction being affirmed on appeal.

The principal opinion states the decision not to call jurors in support of the motion for new trial was reasonable in that counsel believed, because the jury was unable to agree whether to impose the death penalty, the trial judge was unlikely to impose death, as they

3

had never had a trial judge impose a death sentence when the jury could not agree on punishment. In other words, counsel filed a motion for new trial but chose not to support it with testimony in the hopes the judge would give a favorable ruling on death.

If counsel believed errors in the trial merited a new trial, they had a duty to file a proper and supported motion for new trial. They failed to meet their duty by filing a motion they admittedly chose not to fully support with facts. Moreover, if what counsel wanted was to have the judge decide punishment while knowing the jury deadlocked, they could have requested the judge and State consent to doing just that even if a new trial were granted. Failing to investigate juror misconduct, however, was not an option. Yet counsel made the decision to forego any questioning of Juror 58 or the other jurors about whether they were exposed to Juror 58's novel and the extent of that exposure.

"[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitations on investigation." *State v. Butler, 951 S.W.2d 600, 608 (Mo. banc 1997)* (internal quotations omitted) (alteration in original). Defense counsel cannot make a strategic decision not to use evidence if counsel has not investigated the nature of that evidence. *Id. at 610.* "[A]n argument based on trial strategy or tactics is appropriate *only if* counsel is fully informed of facts which should have been discovered by investigation." *Anderson v. State, 66 S.W.3d 770, 776 (Mo. App. 2002)* (quotation omitted) (emphasis added).

While counsel may have believed the better chance of avoiding a death sentence lay in their hope the judge would continue to "be good" to them rather than in raising prejudicial juror misconduct from Juror 58's deliberate exposure of the other jurors to his

4

novel, this belief was not reasonable as counsel had no idea of the seriousness of the exposure of the other jurors to the virulently anti-defendant violent rhetoric of the book. "The mere assertion that conduct of trial counsel was 'trial strategy' is not sufficient to preclude a movant from obtaining post-conviction relief." *Wilkes v. State, 82 S.W.3d 925, 930 (Mo. banc 2002)*. Counsel does not have to choose between hoping for mercy from a judge or presenting valid claims in the client's defense, and this Court should not excuse counsel's failure to follow up here as trial strategy.

The postconviction record reveals multiple instances of the jurors being exposed to the novel and to comments about it by Juror 58. By that point they minimized their exposure to the novel, but this Court long has recognized, in the context of voir dire, a juror cannot be the judge of his or her own qualifications. *Beggs v. Universal C.I.T. Credit Corp., 387 S.W.2d 499, 503 (Mo. banc 1965)*; *Theobold v. St. Louis Transit Co., 90 S.W. 354, 359 (Mo. 1905)*.

The same reasoning applies to the juror's evaluation of the effects of exposure during deliberations to inappropriate influences such as Juror 58's novel. *See Travis v. Stone, 66 S.W.3d 1, 4, 6 (Mo. banc 2002)* (instructing "little weight be given to the offending juror's assessment of the effect of this conduct" and noting prejudice cannot be cured by "statements of the juror tending to minimize the effect of this conduct"). The difficulty in determining the effect on the jury of this novel and of Juror 58's statements was exacerbated by the long delay before jurors finally were questioned.

Counsel's ineffectiveness may well have affected the decision to leave Juror 58 on the jury for the guilt phase and could well have affected the jury's inability to decide on

5

punishment.  This Court should set aside the conviction and sentence of death.

For these reasons, I respectfully dissent.

_____

**LAURA DENVIR STITH, JUDGE**