

# MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| PATRICK RYAN POWELL, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | WD86734 |
| | ) | |
| STATE OF MISSOURI, | ) | Filed: May 6, 2025 |
| | ) | |
| Respondent. | ) | |

**Appeal from the Circuit Court of Jackson County
The Honorable Jalilah Otto, Judge**

**Before Special Division: Anthony Rex Gabbert, C.J.,
Alok Ahuja, J., and Karen L. Krauser, Sp. J.**

Following a jury trial in the Circuit Court of Jackson County, Patrick Powell was convicted of first-degree murder and armed criminal action. After we affirmed Powell's convictions on direct appeal, he filed a motion for post-conviction relief under Supreme Court Rule 29.15. Powell's amended motion argued that his trial counsel was ineffective: for failing to object to the foundation and relevance of photographs of a gun discovered on the victim's phone; for failing to object to the foundation for certain surveillance video; and for failing to introduce evidence that a key State witness knew Powell's name before the crime. Powell also contended that he was entitled to a new trial because the State had violated *Giglio v. United States*, 405 U.S. 150 (1970), by failing to disclose

information he could have used to impeach the credibility of the lead detective on the case. The circuit court denied relief following an evidentiary hearing. Powell appeals. We affirm.

## Factual Background

We view the evidence in the light most favorable to the jury's verdict. *See*, *e.g.*, *McFadden v. State*, 619 S.W.3d 434, 444 & n.1 (Mo. 2020); *Jolley v. State*, 678 S.W.3d 700, 702 n.3 (Mo. App. W.D. 2023) (quoting *Martin v. State*, 655 S.W.3d 195, 197 n.2 (Mo. App. W.D. 2022)).

On November 11, 2017, Victim was shot and killed in the upstairs apartment of a duplex, where he lived with his Girlfriend in midtown Kansas City.[1]

On or about November 4, 2017, Powell's girlfriend ("Friend") came by the Victim and Girlfriend's house to drop off a gun for safekeeping. A few days later Friend returned to retrieve the gun, but Victim had taken it. Victim told his Girlfriend to tell Friend that Girlfriend could not find the gun.

Friend came back to retrieve the gun in the late afternoon on November 11. Prior to coming to the duplex, Friend exchanged text messages with Victim about the gun. At 1:45 p.m., Victim texted Friend, "Ok so what's up with the gun thing? Is that why you came out here the other night?" Friend responded, "Yeah I had her stash it for me and when I came back it had disappeared." Victim texted, "Ok I will get it for you and make sure you get it back"; he later texted, "Ok, I got the firecracker." At about 4:54 p.m., Friend texted that she was on her way. At 5:33

---

[1]     Pursuant to § 509.520.1(5), RSMo, we do not provide the names of any non-party witnesses in this opinion.

p.m., Friend texted Victim, asking him to unlock his door for her; Victim responded two minutes later to confirm that the door was unlocked.

After the shooting, police obtained surveillance footage from a home directly to the north of Victim's, and from a McDonald's restaurant near Victim's home. Footage from the neighbor's camera showed a silver BMW sedan arrive at Victim's duplex at approximately 5:39 p.m. on November 11. Girlfriend testified that the sedan was the car she had seen Friend driving.

Girlfriend testified that she let Friend in the apartment, and directed Friend to where the gun was located in a bedroom (although Girlfriend did not actually see Friend in possession of the gun). As reflected in the neighbor's surveillance video, Friend left in the silver BMW at approximately 5:47 p.m.; the car turned south towards the nearby McDonald's.

Girlfriend testified that she and the Victim smoked methamphetamine in between Friend's visit and when Victim was shot.

Around 5:48 p.m., Friend's BMW appeared on the McDonald's surveillance footage, pulling into the drive-through lane. The McDonald's footage showed Friend and a passenger in the car. The car left the McDonald's parking lot at 5:59 p.m.

At approximately 6:11 p.m., neighbor's camera captured a hooded man walking up the driveway toward Victim's residence. Girlfriend testified that she heard a knock at the back door of their apartment, and went to check the door with Victim. As Girlfriend opened the door a gunman pushed the door open and fired two shots. Girlfriend testified that the gunman said, "Do you remember me, bitch?" The gunman fired three more shots and hit Victim. Girlfriend recalled

3

that either the Victim, or the shooter himself, identified the gunman as Patrick. Girlfriend described the shooter as a white man, around six feet tall, heavy-set, with shoulder-length brown hair and a beard.

The shooter immediately fled. At approximately 6:13 p.m., neighbor's surveillance video showed a man in a hooded jacket running down the driveway from Victim's house, and turn in the direction of the McDonald's restaurant. At approximately 6:14 p.m., a man similar in appearance to the one shown running away from Victim's house appeared on the McDonald's surveillance footage, coming from the direction of the house. Powell's counsel later conceded that Powell was the one visible on the McDonald's surveillance video (although Powell disputed that he was the one depicted on the video from the neighbor's home). At about 6:17 p.m., the silver BMW pulled into a parking space at the McDonald's, and Powell entered the front passenger-side door.

Girlfriend testified that the Victim yelled out that he had been shot, leading the landlord and a couple of other duplex residents to come upstairs. Girlfriend testified that Victim told the landlord, "It was Patrick, [Friend's] boyfriend" (although a detective testified that no witness other than Girlfriend identified the shooter as "Patrick"). Girlfriend called 9-1-1 and reported that Victim had been shot by a white man named Patrick; Girlfriend related that Patrick had opened the door and fired five shots.

Victim died as a result of his gunshot wounds.

A Kansas City Police Department Officer responded to the scene of the shooting. Officer found four .380 shell casings in the foyer of Victim's duplex. A firearms examiner from the Kansas City Crime Laboratory testified that the shell

4

casings had been fired by a single gun. Three .38 caliber bullets were also recovered, and were also determined to have been fired by a single firearm. The firearms examiner could not say, however, whether "the shell casings and the bullets went together."

A search of Victim's phone revealed pictures of a silver-colored BMW sedan and a .380 semi-automatic black handgun. Girlfriend testified that the gun depicted in the photograph was similar to the one Friend had given her for safekeeping. A partial serial number was visible on the handgun; records reflected that the handgun had been purchased by Powell's mother. The handgun could not be located during a search of Powell's mother's home, where Powell lived.

The photo of the silver BMW sedan on Victim's phone contained a partial vehicle identification number (or "VIN"). The VIN identified the vehicle as one that had been abandoned in a parking lot in Lee's Summit the day after the shooting. DNA from Powell and from Friend was recovered from objects in the BMW.

Surveillance video from a Walmart in Independence during the evening of the shooting showed persons resembling Powell and Friend driving a silver BMW to the store. One figure had long hair and a beard, and wore clothing similar to what Powell was seen wearing at the McDonald's restaurant.

Following a jury trial, Powell was convicted of first-degree murder and armed criminal action. The circuit court sentenced him to concurrent sentences of life imprisonment without parole for first-degree murder, and ten years' imprisonment for armed criminal action.

5

Powell appealed his convictions to this Court. We affirmed the circuit court's judgment in an unpublished order. *State v. Powell*, No. WD82799, 611 S.W.3d 757 (Mo. App. W.D. Sept. 8, 2020) (*mem.*). Our mandate in Powell's direct appeal issued on December 30, 2020.

On February 2, 2021, Powell filed a motion for post-conviction relief under Supreme Court Rule 29.15. In an amended motion, Powell raised eight claims, five of which are at issue in this appeal. As relevant here, Powell's amended motion contended that his trial counsel was ineffective for failing to object to the pictures of the gun found on Victim's phone for lack of foundation and lack of legal relevance; for failing to object to the McDonald's surveillance video based on a lack of foundation; and for failing to introduce evidence that Victim had previously told Girlfriend that Friend's boyfriend was named Patrick. The amended motion also argued that Powell was entitled to a new trial because the State had failed to disclose evidence relevant to impeach the credibility of one of the State's witnesses, the lead Detective in the case, in violation of *Giglio v. United States*, 405 U.S. 150 (1970).

After holding an evidentiary hearing, the circuit court denied Powell's motion for post-conviction relief. The circuit court found that Powell had failed to show either deficient performance by counsel, or any resulting prejudice, based on counsel's failure to object to the foundation for the gun photos on Victim's phone. The court found that counsel had a reasonable strategic reason for failing to object to the gun photos, based on counsel's testimony that "he did not believe he could make a valid foundation objection to the photos," and that

6

"he wanted the photos in evidence for his use during the cross examination of [Girlfriend]."

The circuit court also rejected Powell's claim that counsel was ineffective for failing to object to the gun photos on legal relevance grounds. The court observed that

> [t]he photo displayed a handgun matching the caliber of the murder weapon. The State established that the Movant's mother owned the same caliber of handgun, and it was missing. [Girlfriend] testified that she previously made an identification of the gun in the photo as similar to the one she saw on the night of murder.

(Footnotes omitted.) The circuit court credited trial counsel's testimony that he did not believe that he could make a successful relevance objection, and that he wanted the photographs in evidence for use in Girlfriend's cross-examination. The circuit court rejected the legal relevance claim based on its conclusion that Powell had failed to satisfy either the performance or prejudice prongs of the *Strickland* standard.

The circuit court denied Powell's claim that his trial counsel was ineffective for failing to object to the McDonald's security footage for lack of foundation. The court noted that, at the post-conviction relief evidentiary hearing, Powell called the restaurant's manager from 2017 to testify. The manager "testified he provided the Kansas City Police with the footage . . ., and testified the system was working properly and no one had access to manipulate the footage." The circuit court found that trial counsel made a reasonable strategic decision not to object to the McDonald's footage on foundation grounds, but instead to stipulate to foundation.

7

Powell's amended motion also claimed that trial counsel was ineffective for failing to introduce evidence that Girlfriend was aware of Powell's first name before the shooting. The evidence at issue comes from Girlfriend's recorded statement to police. During that statement, Girlfriend was asked why Friend couldn't keep the gun in her own home. Girlfriend stated that Friend had told the Victim that she couldn't keep the gun at home "[b]ecause she was trying to get away from Patrick." The circuit court noted counsel's testimony that, if he had asked Girlfriend about her prior knowledge of Powell's first name, "this line of questioning would have put more attention on the connection between [Powell], [Friend], [Girlfriend], and the gun." The court found that

> trial counsel did attempt to impeach [Girlfriend] on a number of different topics. Trial counsel's cross-examination of [Girlfriend] was quite lengthy and her testimony contained a number of inconsistencies. Attempting to impeach [Girlfriend] on a topic that would require the jury to focus on [Friend] giving the gun to [Girlfriend] could have been more harmful than helpful.

The court found that Powell's claim failed for failure to show deficient performance or resulting prejudice.

Finally, the circuit court rejected Powell's claim that he was entitled to a new trial based on the State's failure to turn over material which would have impeached the credibility of the lead Detective on the case. The impeachment material concerned Detective lying in a report in 2004 about the disposition of a vehicle whose occupants had been arrested. The vehicle disappeared after Detective left the vehicle at the scene of the arrest, with the keys in the car. The Police Department concluded that Detective had lied in his report to conceal his

8

own failure to properly secure the vehicle, and gave him a 10-day suspension. The incident occurred during Detective's first year with the Police Department.

The circuit court found that "the State had the burden to disclose the materials" concerning the 2004 incident to Powell. The court also found, however, that the failure to disclose the impeachment material was inadvertent, not intentional; the court noted that, after the material was later discovered, it was disclosed by the State to the defense in Friend's trial. Although the State had a legal obligation to disclose information concerning Detective's 2004 discipline, the court found that the undisclosed information "was not material and would not have affected the trial strategy of trial counsel or the outcome of the trial." The court noted that the incident was "remote in time," and was an isolated incident in Detective's personnel history. The court also found that Detective's testimony largely concerned uncontroversial matters:

> Detective['s] . . . testimony was mostly about what was gathered in the investigation and what was already stipulated to as evidence. Thus, a review of Detective['s] . . . testimony shows that the testimony was not one of controversy. Detective . . . was a ministerial witness for the most part, merely testifying about the overall investigation. Thus, the reliability of Detective . . . was not determinative of guilt or innocence.

Although Powell claimed that challenging Detective's credibility could have supported an attack on the timestamp on the McDonald's restaurant surveillance footage, the court found that "[t]his claim ignores the parties' stipulation to the foundation of the McDonald's surveillance video. In addition, trial counsel credibly testified that based on the evidence in the case, he would not have accused Detective . . . of manipulating the time stamp of the McDonald's surveillance video."

9

Powell appeals.

## Discussion

[T]he standard of review for postconviction matters is what Rule 29.15(k) and Rule 24.035(k) say it is, i.e., that "review of the trial court's action . . . shall be limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous." [T]his includes *de novo* review for errors of law, rejection of factual findings for which there is no substantial evidence, and – in the rarest of cases – rejection of factual findings for which there may be substantial evidence but regarding which the reviewing court, nevertheless, on the entire record, is left with a definite and firm conviction (or impression) that a mistake has been made. In applying this standard, appellate courts should defer to the motion court's superior opportunity to judge the credibility of witnesses and recognize the "circuit court is entitled to believe all, part, or none of the evidence presented at the post-conviction hearing."

*Flaherty v. State*, 694 S.W.3d 413, 419 (Mo. 2024) (cleaned up).

## I.

In his first Point, Powell argues that circuit court clearly erred in denying his claim that trial counsel was ineffective for failing to object to the pictures of a gun found on Victim's phone, based on a lack of foundation.

In ineffective assistance of counsel cases, the burden is on the movant to overcome the strong presumption that counsel was competent; the movant must prove deficient performance by a preponderance of the evidence. *Strickland v. Washington*, 466 U.S. 668, 690 (1984). A movant must not only show deficient performance, but also that they were prejudiced by counsel's incompetence. Prejudice is established when "[the] defendant . . . show[s] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694 (cleaned up). "[A] court

10

need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

"The mere failure to make objections does not constitute ineffective assistance of counsel." *Shockley v. State*, 579 S.W.3d 881, 909 (Mo. 2019) (quoting *Dorsey v. State*, 448 S.W.3d 276, 289 (Mo. 2014)). "'A trial counsel's failure to object is ordinarily trial strategy and therefore afforded considerable deference.'" *Stuckey v. State*, 682 S.W.3d 75, 82 (Mo. App. E.D. 2023) (citation omitted). "To obtain postconviction relief based on a failure to object, it 'must have been of such character as to deprive the defendant substantially of his right to a fair trial." *Shockley*, 579 S.W.3d at 909 (citation omitted). "Moreover, to prevail on a claim of ineffective assistance of counsel for failing to object to the admissibility of an exhibit based on lack of foundation, a movant must establish that the necessary foundation could not have been laid to overcome such an objection." *Rabun v. State*, 614 S.W.3d 629, 633 (Mo. App. E.D. 2020). "Counsel will not be held ineffective for failing to make a nonmeritorious objection." *Shockley*, 579 S.W.3d at 909.

At trial, the State introduced multiple photographs of a handgun taken from Victim's phone. An intelligence analyst with the Kansas City Police Department testified that he extracted the contents of Victim's phone, and did not alter the phone's contents in the process. Detective testified that law enforcement traced the serial number visible in two of the photographs to "this

particular 380 handgun." The purchase records identified the gun as a Smith & Wesson, Model M&P Bodyguard. Consistent with the purchase records, the pictures of the gun reflected an "M&P Bodyguard" stamp. The purchase records identified Powell's mother as the gun's purchaser. Powell's trial counsel did not object to the admissibility of the photographs.

> To provide a proper foundation for admitting a photograph, the proponent of the photograph must show that the photograph is "an accurate representation of what it purports to show" via "the testimony of any witness who is familiar with the subject matter of the [photograph] and competent to testify from personal observation." As a result, the testimony of any witness who is familiar with the subject matter of the photograph through his or her personal observations is competent to provide a proper foundation for the photograph's admission into evidence. Indeed, the creator of a photograph is not required to testify at trial in order to establish the proper foundation for a photograph. Additionally, the witness need not know the circumstances of the creation of the photograph or necessarily have observed the exact view of the subject matter as depicted by the photograph.

*State v. Brownlee*, 501 S.W.3d 556, 559 (Mo. App. E.D. 2016) (citations omitted). "Trial courts have broad discretion regarding the admission of photographs. This broad discretion includes the trial court's determination of whether the photograph's proponent provides a proper foundation for admitting the photograph into evidence." *Id.* at 558-59 (citations omitted).

The circuit court did not clearly err in finding that counsel reasonably chose not to make a meritless objection to the foundation for the gun photographs. The testimony of the intelligence analyst established that the pictures accurately reflected the images on Victim's phone, and had not been altered during the extraction process. Detective's testimony laid an adequate

12

foundation that the photographs accurately depicted a gun purchased by Powell's mother. Detective testified that the gun was of the correct model and caliber, and bore the serial number of the gun Powell's mother purchased. While Detective did not testify to the particular circumstances surrounding the taking of the picture, or the specific time when it was taken, this did not affect the foundation for the exhibit. Notably, the State did not rely on the particular *condition* of the gun as depicted in the photographs, or the particular timing or circumstances under which the pictures were taken.

Powell failed to demonstrate that the State could not lay a foundation for the gun photos. He now argues that the State failed to present evidence to establish that the photographs had not been altered before they were extracted from the phone. In this post-conviction relief proceeding, however, it is *Powell* who bore the burden of proving that the State could not have laid a foundation for the gun photos if a timely objection had been made. Powell presented no evidence that the State could not have presented evidence, through the intelligence analyst, Detective, or another witness, that the photographs on Victim's phone had not been altered since being taken. Powell's failure to do so is fatal to his claim. *See Rabun*, 614 S.W.3d at 633 (affirming the denial of a similar claim where the movant failed to prove that the State could not have called a witness to lay a proper foundation for the relevant evidence, even if counsel had objected at trial).

Point I is denied.

13

## II.

In his second Point, Powell argues that the circuit court clearly erred in rejecting his claim that trial counsel was ineffective for failing to object to the gun photographs for lack of legal relevance.

To be admissible, evidence must be both logically and legally relevant. Logical relevance refers to the tendency of the evidence "to make the existence of a material fact more or less probable." *State v. Anderson*, 306 S.W.3d 529, 538 (Mo. 2010). Legal relevance requires a comparison of the evidence's probative value relative to the risk it presents of "unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Id.*

The Missouri Supreme Court has recognized that evidence of firearms unconnected to a charged offense may not meet the legal relevance test.

> This Court has long identified the unfair prejudice of introducing weapons not connected to the defendant or the crime. First, there is a natural tendency to infer from the mere production of any material object, and without further evidence, the truth of all that is predicated of it. Secondly, the sight of deadly weapons or of cruel injuries tends to overwhelm reason and to associate the accused with the atrocity without sufficient evidence.

*State v. Anderson*, 76 S.W.3d 275, 277 (Mo. 2002) (cleaned up).

The State need not prove that a particular weapon is connected to the defendant or to the crime *beyond a reasonable doubt*, however.

> Identifications of weapons need not be unequivocal; however, a sufficient foundation must be laid that the gun introduced is the gun used in the crime so that a juror could find it to be that gun without resort to speculation. To warrant the admission in evidence of an instrument or weapon as the one with which the crime was committed, a prima facie showing of identity and connection with the crime is necessary and sufficient; clear, certain, and positive proof is not required. Less than absolute identifications of real

14

> evidence speak to the weight of the evidence, not admissibility.
> Weapons are admissible into evidence even though they are not
> directly connected with the defendant when they bear on the crime
> with which he is charged[;] positive proof or unqualified
> identification is generally not required. To admit the gun, the State
> is . . . not required to prove that it was the same gun beyond all
> reasonable doubt.

*State v. Miller*, 208 S.W.3d 284, 288 (Mo. App. W.D. 2006) (cleaned up).

The State presented sufficient evidence to make "a prima facie showing" that the gun was connected to Powell, and to the crime. As discussed above in § I, the State presented evidence that the gun depicted in the photographs had been purchased by Powell's mother. Powell lived with his mother, and the gun could not be located after Victim's murder. The gun matched the caliber of shells, and bullets, recovered from the scene and from the Victim's body. And Girlfriend testified that the gun depicted in the photographs was similar to the gun which Friend had given to Girlfriend for safekeeping – which Friend then picked up less than 30 minutes before Victim's murder. Powell was Friend's boyfriend, and was seen riding in the vehicle which Friend had driven to Victim's duplex to pick up the gun.

Besides the fact that the gun's *probative value* was substantial given its connection to Powell and to the crime, we also note that the gun was depicted only in pictures, not by physical evidence. "Any prejudicial effect [the firearms evidence] would have had was minimized by admitting only photographs of the evidence, not the guns and ammunition themselves." *State v. Hosier*, 454 S.W.3d 883, 896 (Mo. 2015).

The circuit court did not clearly err in concluding, in these circumstances, that a legal relevance objection would not have been successful, and that counsel was not ineffective for failing to assert such an objection. Point II is denied.

**III.**

In his third Point, Powell argues that the circuit court clearly erred in denying his claim concerning trial counsel's failure to object to the McDonald's security video for lack of foundation.

In *State v. Moyle*, 532 S.W.3d 733 (Mo. App. W.D. 2017), this Court adopted the "silent witness" theory, which can be used to lay a foundation for recordings where no witness could testify that the recording accurately depicts particular events. We explained:

> Under the "silent witness" theory, the video or photograph being offered as evidence is considered "a silent witness which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness." . . .
>
> . . . [W]here a reasonable foundation indicating the accuracy of the process producing a video or photograph is established, the video or photograph may be received as evidence having inherent probative value and such credibility and weight as the trier of fact deems appropriate.
>
> In determining whether a proponent of this type of video or photographic evidence has satisfied this foundational standard, a trial court should consider: 1) whether the camera, recording system and storage method were working properly at the time of the events depicted; 2) the historic reliability of the camera, recording system and storage method used and whether they are sufficiently protected from tampering by third parties; and 3) whether the recording in the medium presented at trial is a fair and accurate portrayal of the recording in its original form and has not been altered, tampered with or modified (or that any alteration or modification is

> sufficiently explained and does not affect the reliability or accuracy of the evidence).

*Id.* at 736-37 (citations omitted).

At the evidentiary hearing, Powell called the Manager of the McDonald's restaurant, who had turned the video recording over to the police, to testify. Manager testified that the surveillance system was operating properly at the time of Victim's murder, and had not been tampered with. Manager testified that only he and two other restaurant employees had the ability to access the recording system, and that no one at the restaurant could alter the timestamp. Manager testified that he could not recall the last time the restaurant had had trouble with the recording system. Manager also recalled speaking with the police about the recording system when they collected the recording. Manager testified that "I definitely would have talked to them about" the timestamp on the recording, although he did not have a "specific memory" of having done so in this instance. Manager had testified at Friend's later trial that the recording system was kept in a secure location, had operated reliably, and provided accurate images of events in and around the restaurant. Manager testified that he would have provided similar testimony in Powell's trial if he had been called.

Powell emphasizes gaps in Manager's testimony concerning the recording system: for example, Manager could not recall the manufacturer of the cameras or the recording system, or specific times prior to November 2017 when the restaurant had problems with the system. During the evidentiary hearing, however, Manager testified that others (including his supervisor and the restaurant's owner) could have provided the information he could not. In addition, Manager testified at the post-conviction evidentiary hearing in August

17

2022. This was almost five years after the murders, almost three-and-a-half years after Powell's trial in March 2019, and almost three years since Manager left the McDonald's restaurant for other employment in December 2019. The circuit court could reasonably conclude that Manager's recollection would have been more specific closer in time to the events in question, when he was still working at the restaurant, and that the State could have called other witnesses to supplement Manager's testimony if contemporaneous objections had been made to the foundation for the video recording. The circuit court did not clearly err in concluding that Powell had failed to prove that the State would not have been able to lay a foundation for the video recording, and in rejecting Powell's claim that counsel was ineffective for failing to make a foundation objection. Point III is denied.

## IV.

In his fourth Point, Powell argues that the circuit court clearly erred in rejecting his claim that trial counsel was ineffective for failing to present evidence that Girlfriend knew Powell's first name before the shooting incident. Powell contends that, with evidence that Girlfriend knew his name prior to the murder, counsel could have argued that Girlfriend was simply guessing as to the shooter's identity, and had not heard the name "Patrick" either from Powell or from the Victim at the time of the crime.

> Reasonable choices of trial strategy, no matter how ill-fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance. "[S]trategic choices made after a thorough investigation of the law and the facts relevant to plausible op[t]ions are virtually unchallengeable[.]" *Strickland,* 466 U.S. at 690. Where counsel has investigated possible strategies, courts should rarely second-guess counsel's actual choices.

18

*Anderson v. State*, 196 S.W.3d 28, 33 (Mo. 2006) (cleaned up). "It is not ineffective assistance of counsel for an attorney to pursue one reasonable trial strategy to the exclusion of another, even if the latter would also be a reasonable strategy." *Clayton v. State*, 63 S.W.3d 201, 207-08 (Mo. 2001).

Powell argues that trial counsel's failure to question Girlfriend about her prior knowledge of Powell's first name was not a decision made after "thorough investigation of the law and the facts relevant to plausible options," because trial counsel conceded at the post-conviction hearing that he had not considered using evidence of Girlfriend's prior knowledge to explain why Girlfriend named "Patrick" as the shooter.

Powell's argument misreads *Strickland*. Trial counsel <u>did</u> thoroughly investigate the relevant facts and law. Prior to trial, counsel had read Girlfriend's recorded statement to police, in which she stated that she had heard from Victim, before the shooting, that Friend couldn't store the gun at her own house "because she was trying to get away from Patrick." While trial counsel may not have considered a particular *strategic option* (using this statement to explain how Girlfriend knew Powell's first name), counsel was aware of the relevant factual circumstances. This is not a case where counsel made a strategic decision without adequate factual or legal investigation.

In addition, trial counsel testified that introducing this statement would not have been helpful. At the evidentiary hearing, trial counsel testified:

> I don't think it would have been beneficial. You know, that would have put more of an attachment between Mr. Powell and [Friend] and [Girlfriend] and a gun. So I didn't think that that would be beneficial to our case.

Even though another strategy may be equally reasonable, counsel's strategic choices are "virtually unchallengeable" when they are made after a "thorough investigation of the law and the facts relevant to plausible options." *Strickland*, 466 U.S. at 690. Trial counsel's belief that proving Girlfriend's foreknowledge of Powell's name would not be helpful was a reasonable one. Friend's statement to the Victim – that she could not keep the gun at home "because she was trying to get away from Patrick" – could suggest (1) that she was concerned what Powell might do if he had access to the gun; and/or (2) that she was trying to leave their relationship, but was having difficulty doing so. Neither of those alternatives would paint Powell in a positive light. Moreover, as the State points out in its Brief, "Even if [Girlfriend] had heard the name Patrick prior to the day of the shooting, there is no reason that she would have randomly offered him up as the shooter."

The circuit court did not clearly err in concluding that trial counsel was acting strategically when he chose not to mention the circumstances under which Girlfriend first learned Powell's name. Point IV is denied.

## V.

In his fifth and final Point, Powell claims that the State's non-disclosure of evidence which could be used to impeach Detective violated *Giglio v. United States*, 405 U.S. 150 (1970), and entitles him to a new trial.

*Giglio* requires the State to disclose material in its possession that could be used to impeach or impact the credibility of its potential witnesses. *Id*. at 154-55; *see also Brady v. Maryland*, 373 U.S. 83, 86-87 (1963). Claims of non-disclosure

in violation of *Giglio* are cognizable in Rule 29.15 proceedings. *Hutchinson v. State*, 59 S.W.3d 494, 496 (Mo. 2001).

"Under this rule, the State violates constitutional guarantees of due process if: (1) it does not disclose evidence that is favorable to the defendant because it is exculpatory or impeaching; (2) it has suppressed the evidence either intentionally or inadvertently; and (3) the undisclosed evidence is material." *Duley v. State*, 304 S.W.3d 158, 162 (Mo. App. W.D. 2009). "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding might have been different." *Hutchinson*, 59 S.W.3d at 496 (citing *Hayes v. State*, 711 S.W.2d 876, 879 (Mo. 1986), in turn quoting *United States v. Bagley*, 473 U.S. 667, 684 (1985)). "The question is not whether the jury might have rendered a different verdict but whether, in the absence of the evidence, [defendant] received a fair trial, meaning a verdict worthy of confidence." *Duley*, 304 S.W.3d at 163 (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

The circuit court rejected Powell's *Giglio* claim on the basis that the evidence concerning Detective's prior untruthfulness "was not material and would not have affected the trial strategy of trial counsel or the outcome of the trial." The court noted that the incident occurred in 2004, thirteen years before Victim's murder and 15 years before trial, and was apparently an isolated incident early in Detective's police career. The court also found that Detective had largely testified to uncontroversial matters as "a ministerial witness." We also note that the 2004 incident is materially different than the present circumstance: in 2004, Detective apparently lied or failed to timely disclose information, to cover up his

own mistake of leaving the arrestees' vehicle unsecured; the 2004 incident did *not* involve Detective's falsification of information implicating a suspect.

Powell claims that challenging Detective's credibility could have supported an attack on the time stamp of the McDonald's restaurant surveillance footage. As Powell points out, the State relied heavily at trial on an exhibit which combined the neighbor's security-camera footage with footage from the McDonald's, to construct a video timeline of the events before and immediately after the murder. Powell emphasizes that, if the timestamp on the McDonald's footage was inaccurate, this would seriously undermine the State's entire case.

The circuit court did not clearly err in rejecting this claim. The court observed that "[t]his claim ignores the parties' stipulation to the foundation of the McDonald's surveillance video. In addition, trial counsel credibly testified that based on the evidence in the case, he would not have accused Detective . . . of manipulating the time stamp of the McDonald's surveillance video." The circuit court's findings are supported by trial counsel's testimony at the evidentiary hearing:

> [S]pecific to attacking the timestamp on the McDonald's video, I can't say [that I would have used the *Giglio* material]. I mean, no one has told me that Detective . . ., you know, previously was found to manipulate timestamps on videos. If that's what it was, obviously, I would have used that in my questioning of Detective . . . . I don't know what it was and I don't know how it would have applied to the evidence in this case.
>
> . . . .
>
> . . . I have not been presented with anything today that would have made me question the timestamp based on that information.

It is not clear the undisclosed information would even have been admissible. The defense attempted to impeach Detective with the same disciplinary history during Friend's trial (where the information was timely disclosed). In that case, the circuit court sustained the State's objection on the basis that the information was remote in time, "while [Detective] was still a rookie," and was an isolated incident. If the undisclosed information was not even *admissible* as impeachment evidence, it obviously could not satisfy *Giglio*'s materiality standard.

The circuit court could also reasonably find that, if the timestamp of the McDonald's footage had been challenged at trial, the State would have presented additional evidence to bolster the timestamp's accuracy. Evidence concerning the reliability of the timestamp was not well-developed during Powell's trial, because counsel stipulated to the admissibility of the recording. Detective <u>did</u> testify, however, that if there had been any discrepancy in the timestamp, "It would have been notated in my report" – but his report contained no such notation. Detective's testimony could have been supported with testimony from the McDonald's restaurant Manager. At the post-conviction evidentiary hearing, Manager testified that no one at the restaurant could alter the timestamp. The Manager also testified that "I definitely would have talked to [the police] about" the timestamp when they collected the recording, although he did not have a "specific memory" of having done so, almost five years after the fact.

In addition, it does not appear that Detective would have had the knowledge, or the opportunity, to falsify information about the timestamp in order to make the McDonald's footage coincide with the video collected from the

23

neighbor. Detective collected the footage from the McDonald's in November of 2017; the footage from the neighboring property was collected by another officer around the same time. The timestamp of the neighbor's video footage was inaccurate, and had to be adjusted forward by 21 minutes and 47 seconds. The other officer collected *four hours* of footage from the neighbor's surveillance camera. That video presumably had to be reviewed in its entirety, to locate the two or three minutes of video that were actually relevant to the murder investigation. A similar review-and-winnowing process would have been necessary with respect to the McDonald's video. The videos would then need to be compared and combined. *Only then* could anyone have determined whether the time stamps of the two videos (one adjusted and one not) jibed with one another. At trial in March 2019, the officer who prepared the video compilation testified that she did so "just recently," and that she had excerpted only the parts of the two video recordings which *the prosecuting attorney* requested. It does not appear that Detective played any role in preparation of the video compilation.

Powell's materiality theory depends on Detective *knowing*, *when he prepared his report in November 2017*, that the McDonald's and neighbor's video recordings would only mesh if the McDonald's footage was not time-adjusted. It is not at all clear that Detective would have had such knowledge in time to have acted upon it – *even if* he was motivated to falsify evidence to implicate Powell.

The circuit court did not clearly err in concluding that there was no reasonable probability of a different outcome if the State had timely disclosed the *Giglio* material. As Powell acknowledges in his opening Brief, the standard for

*Strickland* prejudice "finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution[.]" *Strickland*, 466 U.S. at 694." Given the similarities between "materiality" under *Giglio* and the test for *Strickland* prejudice, the Missouri Supreme Court's recent discussion of the standard of review for *Strickland* prejudice determinations bears repeating. In *Flaherty v. State*, 694 S.W.3d 413 (Mo. 2024), the Court emphasized that, where "[t]he judge making [a *Strickland* prejudice] finding was the judge in the underlying criminal trial, . . . this vantage can give the motion court powerful insight into the issues raised in a postconviction proceeding." *Id.* at 423 (citation omitted). "The additional deference due a judge who also presided over the criminal trial weighs strongly in favor of affirming the motion court's finding that [a postconviction relief movant] was not prejudiced by counsel's deficient performance." *Id.* (citation omitted).

The circuit court did not clearly err in concluding that Detective's 2004 disciplinary incident was not "material" under *Giglio*, because there was not "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding might have been different." *See Hutchinson*, 59 S.W.3d at 496 (citation omitted). Point V is denied.

## Conclusion

We affirm the judgment of the circuit court, which denied Powell's motion for postconviction relief.

_Alok Ahuja, Judge_

All concur.